25-1456

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

NETCHOICE,

      Plaintiff - Appellees,

v.

PHILIP J. WEISER, in his official capacity as Attorney General of the State of Colorado,

      Defendant - Appellant.

On Appeal from the United States District Court, District of Colorado
The Honorable William J. Martinez
Senior District Judge

District Court Case No. 25-cv-02538-WJM-KAS

## APPELLANT'S OPENING BRIEF

| | |
|---|---|
| PHILIP J. WEISER<br>Attorney General | Colorado Department of Law<br>1300 Broadway<br>Denver, Colorado 80203 |
| PETER G. BAUMANN*<br>Assistant Solicitor General<br>LANE TOWERY*<br>Assistant Attorney General | Telephone:  720-508-6000<br>E-Mail: peter.baumann@coag.gov<br>      lane.towery@coag.gov<br>*Counsel of Record<br>*Attorneys for Philip J. Weiser* |

## ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

NOTICE OF PRIOR RELATED APPEALS ........................................................ vi

JURISDICTIONAL STATEMENT ................................................................ vi

INTRODUCTION ...................................................................................1

STATEMENT OF ISSUES ......................................................................3

STATEMENT OF THE CASE....................................................................4

    I.     Research shows that social media overuse can damage the mental and physical health of young users. ...................................................................4

    II.    Colorado has taken measured steps to arm young social media users with evidence-based information about social media use...................................7

    III.   NetChoice, a trade association representing some of the largest and most sophisticated social media companies in the world, challenges the law's function requirement. ...................................................................11

SUMMARY OF THE ARGUMENTS ...................................................12

ARGUMENT ...................................................................................14

    I.     Colorado's social media disclosure law is a constitutional regulation of commercial speech. ...................................................................14

        A.    The function required by Section 1601 is a quintessential health and safety product warning and is commercial speech. ...........................15

        B.    If widely adopted, the district court's conclusion that Section 1601 does not regulate commercial speech would call into question decades' worth of authority governing health and safety warnings. ...........................21

    II.   NetChoice cannot carry the heavy burden to support a facial challenge....25

        A.    The district court appropriately considered NetChoice's challenge as a facial challenge, but misapplied *Moody*'s two-part test. ......................27

        B.    On its face, the function requirement satisfies *Zauderer* scrutiny.........29

CONCLUSION ...................................................................................37

STATEMENT REGARDING ORAL ARGUMENT ...........................................37

District Court's Order Granting Preliminary Injunction ............................Exhibit A

# TABLE OF AUTHORITIES

**PAGES**

**CASES**

*Am. Meat Inst. v. USDA*,
760 F.3d 18 (D.C. Cir. 2014)..............................................................................18

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) ................................................................. 12, 17

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) .........................................................................26

*CTIA- The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019)................................... 16–18, 20–21, 30–31, 33–34

*Disc. Tobacco City & Lottery, Inc. v. United States*,
674 F.3d 509 (6th Cir. 2012) ..................................................... 18, 34, 35

*Free Speech Coal., Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024)...................................................... 19, 28, 31

*Grocery Mfrs. Ass'n v. Sorrell*,
102 F. Supp. 3d 583 (D. Vt. 2015) .............................................. 18, 23

*In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
MDL No. 3047, No. 4:22-md-03047-YGR (PHK) (N.D. Cal.)............................6

*Jordan v. Jewel Food Stores, Inc.*,
743 F.3d 509 (7th Cir. 2014) ...............................................................16

*Md. Shall Issue, Inc. v. Anne Arundel Cnty.*,
91 F.4th 238 (4th Cir.) ......................................................... 19, 21, 23

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ......................................... 2, 12, 14, 25–27, 29

*Mrs. Fields Franchising, LLC v. MFGPC*,
941 F.3d 1221 (10th Cir. 2019).........................................................26

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*,
556 F.3d 114 ....................................................................................23

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ........................................ 1, 13–18, 24, 31, 33–34

*Nat'l Ass'n of Wheat Growers v. Bonta*,
  85 F.4th 1263 (9th Cir. 2023) ........................................................... 28, 30

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
  272 F.3d 104 (2d Cir. 2001) ............................................................... 15, 18

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) ................................................................................30

*Ohralik v. Ohio State Bar Ass'n*,
  436 U.S. 447 (1978) ................................................................................16

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*,
  475 U.S. 1 (1986) ...................................................................................31

*R.J. Reynolds Tobacco Co. v. FDA*,
  96 F.4th 863 (5th Cir. 2024) ............................................. 18, 21, 23, 30, 35

*United States v. Salerno*,
  481 U.S. 739 (1987) ................................................................................26

*United States v. Wenger*,
  427 F.3d 840 (10th Cir. 2005) ................................................................17

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ................................................................................15

*X Corp. v. Bonta*,
  116 F.4th 888 (9th Cir. 2024) ................................................... 17, 21, 23

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
  471 U.S. 626 (1985) ............................................................. 13–16, 22

**STATUTES**

2024 Colo. Sess. Laws ch. 460 ...........................................................4, 8

Colo. Rev. Stat. § 6-1-1601 ....................................... 9–10, 19, 30, 36

Colo. Rev. Stat. § 22-2-127.8 .................................................................8

H.B. 1136, 74th Gen. Assemb., 2d Reg. Sess. (Colo. 2024) ...................................1

**OTHER AUTHORITIES**

G. Wells, J. Horwitz, and D. Seetharaman, *Facebook Knows Instagram is Toxic for Teen Girls, Company Documents Show*, Wall St. Journal (Sep. 14, 2021), https://perma.cc/XKN4-E269 ...................................................................6

Letter from 42 State Attorneys General to Congress, *Re: Requiring a Surgeon General's Warning on Social Media Platforms*, (Sep. 9, 2024), https://perma.cc/C89W-YCGQ .............................................................7

M. Cunningham, E. Pandise, *Meta and YouTube found liable on all charges in landmark social media addiction trial*, CBS News (Mar. 25, 2026), https://perma.cc/DH97-SLNZ ........................................................5, 32

M. Lee, *Jury finds Meta's platforms are harmful to children in 1st wave of social media addiction lawsuits*, Associated Press (Mar. 24, 2026), https://perma.cc/4K4U-62DX ........................................................5, 32

Media Literacy Resource Bank, Colorado Department of Education, https://tinyurl.com/4bkv25yy (last visited May 5, 2026)....................................8

National Academies of Sciences, Engineering, and Medicine, *Social Media and Adolescent Health* (The National Academies Press 2024), https://perma.cc/P4JN-4WTD ...............................................................5, 31

Terms of Service, Meta (Jan. 1, 2025), https://perma.cc/DNK7-P6JC ...................20

U.S. Surgeon General, Social Media and Youth Mental Health, The U.S. Surgeon General's Advisory (2023), https://perma.cc/D2TM-KHRH ..................... 6–7, 32

## NOTICE OF PRIOR RELATED APPEALS

No prior or related appeals have occurred.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review the district court's preliminary injunction under 28 U.S.C. § 1292(a)(1). The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

## INTRODUCTION

Nearly all American teens report using social media applications, often for many hours a day, if not almost constantly. As young people's use of social media has dramatically risen, so too have concerns about the risks of addictive design features, compulsive use, and prolonged exposure on children. Today, there is broad consensus that although social media offers opportunities for connection and communication, excessive time online can harm developing minds and bodies.

In 2024, a bipartisan group of legislators introduced and passed HB 24-1136, the Healthier Social Media Use by Youth Act. Through that law, Colorado has required social media platforms to develop a "function" that provides young users with research-backed information about the mental and physical health risks of social media overuse. The law affords platforms substantial flexibility in how they design and implement this function, so long as the information provided is supported by peer-reviewed research or derived from a collection of "research-based scholarly articles" published by the Colorado Department of Education.

Like other "health and safety warnings long considered permissible," *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 775 (2018) ("*NIFLA*"), the Healthier Social Media Use by Youth Act requires only that companies disclose factual, uncontroversial information about their own products. This expression—a commercial actor's speech concerning the attributes of its own

goods and services—is quintessential commercial speech. Colorado's law thus fits comfortably within the longstanding tradition of government measures designed to ensure that commercial speech is accurate, and that consumers receive complete and reliable information in the marketplace. Like those measures, Colorado's law is fully consistent with the First Amendment.

In holding otherwise, the district court erred by finding that HB 24-1136's requirement that companies disclose research-backed information about their own products does not regulate commercial speech and is therefore subject to strict scrutiny. The court then compounded that error by invalidating the law on its face without undertaking the application-specific analysis required by *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).

The district court erred as a matter of law in treating these disclosures as non-commercial speech, and the preliminary injunction should be vacated. And because the law affords each covered company substantial discretion over the content and form of its disclosure, so long as it provides youth users with evidence-based, research-backed information about the health risks of excessive social media use, NetChoice is unlikely to carry its heavy burden of establishing that the law violates the First Amendment on its face.

## STATEMENT OF ISSUES

1.     Whether a law requiring social media companies to disclose research-backed information about the health effects of their products to its consumers regulates commercial speech.

2.     Whether NetChoice is likely to succeed on its facial First Amendment challenge where the challenged law affords covered companies substantial discretion in how they design and present compliant disclosures, resulting in a wide range of constitutional applications.

## STATEMENT OF THE CASE

**I.    Research shows that social media overuse can damage the mental and physical health of young users.**

For many young users, social media has become a near-daily aspect of their lives. "In the United States, up to 95% of youth ages 13 to 17 report using social media platforms, and a third of youth report using social media 'almost constantly.'" 2024 Colo. Sess. Laws ch. 460, § 1(1)(c). According to one study, users between the ages of 12 and 15 spend an average of three-and-a-half hours a day on social media, "with one in four youth spending five or more hours a day on the platforms, and one in seven spending seven or more hours a day on social media." *Id.* § 1(1)(d).

Unsurprisingly, research shows that such prolonged use is damaging to young people's mental and physical health. One study found that users between the ages of 12 and 15 who spend three or more hours a day on social media have "double the risk of experiencing poor mental health outcomes" as their peers, "including experiencing symptoms of depression and anxiety." *Id.* And a "systematic review of 42 studies on the effects of excessive social media use found a consistent relationship between social media use and poor sleep quality, reduced sleep duration, sleep difficulties, and depression among youth." *Id.* § 1(1)(e). Additional research has likewise documented that excessive social media use is associated with significant opportunity costs, including reduced physical activity,

4

disrupted sleep, and fewer in-person social interactions. *See* National Academies of Sciences, Engineering, and Medicine, *Social Media and Adolescent Health* 99–100 (The National Academies Press 2024), https://perma.cc/P4JN-4WTD.

These concerns are heightened by the economic incentives underlying social media platforms. Platforms benefit when users spend more time engaged with their services, increasing opportunities to collect user data, deliver advertisements, and cultivate long-term brand loyalty. Social media companies therefore have strong incentives to design products that maximize user engagement and the time spent on their platforms. Earlier this year, a New Mexico jury concluded that Meta "engaged in 'unconscionable' trade practices that unfairly took advantage of the vulnerabilities of and inexperience of children.'" M. Lee, *Jury finds Meta's platforms are harmful to children in 1st wave of social media addiction lawsuits*, Associated Press (Mar. 24, 2026), https://perma.cc/4K4U-62DX. And just a day later, a California jury concluded that Meta and YouTube were liable "for creating products that led to harmful and addictive behavior by young users." M. Cunningham, E. Pandise, *Meta and YouTube found liable on all charges in landmark social media addiction trial*, CBS News (Mar. 25, 2026), https://perma.cc/DH97-SLNZ.

Social media companies are aware of the risks their platforms pose for underage users. In 2021, the Wall Street Journal reported that Meta's (then

Facebook, Inc.'s) own research found that "Instagram is harmful for a sizable percentage of [young users], most notably teen girls." G. Wells, J. Horwitz, and D. Seetharaman, *Facebook Knows Instagram is Toxic for Teen Girls, Company Documents Show*, Wall St. Journal (Sep. 14, 2021), https://perma.cc/XKN4-E269; *see also id.* (quoting slide from an internal 2019 presentation: "We make body image issues worse for one in three teen girls.").

Court filings in ongoing social media litigation have likewise alleged that Meta halted internal research designed to explore, in part, user well-being, after preliminary findings showed that users' mental health improved after taking a break from the social media platform. *In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, MDL No. 3047, No. 4:22-md-03047-YGR (PHK), Pls.' Corrected Omnibus Opp. to Defs.' Mots. for Summ. J., at 27 (N.D. Cal. Nov. 21, 2025). The same filing quoted a Meta employee warning that "if the results are bad, and we don't publish and they leak, is it going to look like tobacco companies doing research and knowing cigs were bad and then keeping that info to themselves?" *Id.*

Against this backdrop, policymakers have increasingly taken steps to address the harms associated with excessive social media use among young people. In 2023, the United States Surgeon General issued an advisory concerning social media and youth mental health. U.S. Surgeon General, Social Media and Youth

Mental Health, The U.S. Surgeon General's Advisory (2023), https://perma.cc/D2TM-KHRH ("Surgeon General's Advisory") (cited at App. Vol. 1 at 121). While acknowledging that "[m]ore research is needed to fully understand the impact of social media," the Surgeon General's Advisory concluded that "the current body of evidence indicates that while social media may have benefits for some children and adolescents, there are ample indicators that social media can also have a profound risk of harm to the mental health and well-being of children and adolescents." *Id.* at 4. Accordingly, the Advisory called for "action to create safe and healthy digital environments that minimize harm and safeguard children's and adolescents' mental health and well-being during critical stages of development." *Id.*

Following the Surgeon General's Advisory, a bipartisan coalition of 42 state attorneys general called on Congress to enact legislation requiring a surgeon general's warning on social media products. *See* Letter from 42 State Attorneys General to Congress, *Re: Requiring a Surgeon General's Warning on Social Media Platforms*, (Sep. 9, 2024), https://perma.cc/C89W-YCGQ (cited at App. Vol. II at 257; 294–95; 317). To date, Congress has not passed such a law.

## II.    Colorado has taken measured steps to arm young social media users with evidence-based information about social media use.

Against this backdrop, Colorado acted. In 2024, the Colorado General Assembly declared "that it is a matter of statewide concern to provide research-

based education and interventions, including resources on the effects of social media use on brain development . . . to help youth make informed decisions on responsible social media use." 2024 Colo. Sess. Laws ch. 460, § 1(2).

To advance these goals, the Healthier Social Media Use by Youth Act has several requirements. First, the law required the Colorado Department of Education ("CDE") to convene a stakeholder group consisting of educators, school mental health professionals, parents, youths, youth mental health professionals, and technology experts such as "a representative from a technology industry association, or a technology engineer." Colo. Rev. Stat. § 22-2-127.8(1)(c). This stakeholder group was tasked with building a "resource bank," consisting of "evidence-based, research-based scholarly articles and promising program materials and curricula pertaining to the mental and physical health impacts of social media use by youth, internet safety, and cybersecurity." *Id*. § 22-2-127.8(1)(a). At present, this resource bank contains over 40 resources related to social media, ranging from the American Academy of Pediatrics' "Social Media and Youth Mental Health Research Corner," to the National Alliance for Mental Health's one-pager on helpful hints for social media use. *See* Media Literacy Resource Bank, Colorado Department of Education, https://tinyurl.com/4bkv25yy (last visited May 5, 2026).

Second, the law required social media platforms to establish a "function" that provides users under the age of 18 information about the impact of social media on youth mental and physical health and brain development. *See* Colo. Rev. Stat. § 6-1-1601(2) ("Section 1601"). Companies subject to this law have broad discretion over the content of this function, so long as it meets two criteria:

(1) It must "provide users who are under the age of eighteen with information about their engagement in social media that helps the user understand the impact of social media on the developing brain and the mental and physical health of youth users."

(2) It must "be supported by data from peer-reviewed scholarly articles" or, if the social media company prefers, be drawn from "the sources included in the mental health and technology resource bank established" by the law.

*Id.*

To provide companies with "flexibility," *see* App. Vol. II at 253, the law offers platforms two options for complying. First, a company may develop its own function so long as it meets the statutory criteria. Colo. Rev. Stat. § 6-1-1601(1)(a). If it chooses this route, the function must be "informed" by standards established by the state's chief information officer. *Id.*; *see also* Colo. Rev. Stat. § 6-1-1601(5). These standards (a) "[r]ecommend intervals for notification frequency,"

(b) "[p]rovide sample messaging for the content of the notification," (c) "[are] informed by data and research on the efficacy of notifications;" and (d) "[r]ecommend the age range of users who would most benefit from notifications." *Id.*

Alternatively, if a company prefers not to develop its own function, Section 1601 also provides a prescriptive option. Under that approach, the platform must display "a pop-up or full-screen notification to a user who attests to being under the age of eighteen when the user: (I) Has spent one cumulative hour on the social media platform during a twenty-four-hour period; or (II) Is on a social media platform between the hours of 10 p.m. and 6 a.m." Colo. Rev. Stat. § 6-1-1601(1)(b). If a company elects this option, "the function must repeat at least every thirty minutes after the initial notification." *Id*. § 6-1-1601(3).

In sum, a social media platform satisfies Section 1601 so long as it establishes either (1) a function that provides underage users with research-backed information that "helps the user understand the impact of social media on the developing brain and the mental and physical health of youth users," or (2) a time-based pop-up notification.

**III.    NetChoice, a trade association representing some of the largest and most sophisticated social media companies in the world, challenges the law's function requirement.**

Several months before the Healthier Social Media Use by Youth Act's effective date, NetChoice filed this action. App. Vol. I at 7–45. NetChoice, a "nonprofit trade association," *id*. at 10, represents internet companies, including several companies it alleges are regulated by Section 1601, including Meta, Snap Inc., and YouTube, *id*. at 11. Relevant here, NetChoice alleged that Section 1601 violates the First Amendment by compelling the speech of its member companies. *Id*. at 29.[1] NetChoice also moved for a preliminary injunction. *Id*. at 96–130.

After briefing and argument, the district court entered a preliminary injunction prohibiting the Attorney General from enforcing Section 1601. App. Vol. II at 353–79. Although the court recognized that NetChoice sought facial relief, *id*. at 360, it concluded that "the limited record" available at the preliminary injunction stage did not preclude such relief, *id*. at 365–66.

As to the merits of NetChoice's First Amendment claim, the district court held that Section 1601 is subject to strict scrutiny because it does not regulate commercial speech. *Id*. at 369. The court reasoned that the required function does

---

[1] NetChoice also alleged that Section 1601 was unconstitutionally vague, App. Vol. I at 43, and moved for a preliminary injunction on that basis as well, *id*. at 127. Because of its First Amendment holding, the district court did not address NetChoice's vagueness argument.

"far more than merely propose a commercial transaction," *id.* (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)), and on that basis concluded that covered companies' functions would necessarily constitute "expressive—and not commercial—speech," *id*. at 370.

Having determined that strict scrutiny applied, the court accepted the Attorney General's position that "Colorado has a compelling interest in informing youth about the risks of excessive social media use," *id*. at 377 (quotation omitted). Nevertheless, it concluded that NetChoice was likely to establish that the law's "unconstitutional applications 'substantially outweigh' its constitutional ones." *Id*. at 378–79 (quoting *Moody*, 603 U.S. at 723). The court preliminarily enjoined the Attorney General from enforcing the law, *id*. at 379, and this appeal followed.

## SUMMARY OF THE ARGUMENTS

Colorado enacted the Healthier Social Media Use by Youth Act in response to the growing consensus that excessive social media use can harm the mental and physical health of young people. The law requires covered social media companies to provide young users with factual, research-backed information about the health risks of excessive social media use. In doing so, Section 1601 resembles the many product health and safety disclosures long recognized as constitutionally permissible, including warnings on tobacco, alcohol, sugary food, hazardous houseful products, children's toys, and other consumer goods. Indeed, Colorado's

12

law is less prescriptive than many traditional disclosure requirements because it affords covered companies substantial discretion in how they design and present the required information.

For decades, courts have recognized that compelled disclosures concerning a company's own products and services are subject to a deferential, rational-basis review when they require the disclosure of factual and uncontroversial information. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626 (1985). The Healthier Social Media Use by Youth Act fits well within that framework. The law regulates commercial speech by requiring companies to provide consumers with research-backed information about the effects of their own products.

The district court therefore erred in subjecting Section 1601 to strict scrutiny. If allowed to stand, the court's reasoning would call into question the constitutionality of the "health and safety warnings long considered permissible." *NIFLA*, 585 U.S. at 775.

The district court also erred in granting facial relief without conducting the application-specific analysis required by *Moody*. Section 1601 affords covered companies broad flexibility in how they comply with the law, including substantial discretion over the content, format, timing, and presentation of any disclosure. As a result, the law is capable of a wide range of constitutional applications across numerous platforms, products, and user experiences. Yet the district court enjoined

13

the law on a limited preliminary injunction record without knowing what disclosures companies may ultimately choose to provide or how the law will operate in practice. As Justice Barrett recognized in *Moody*, "dealing with a broad swath of varied platforms and functions in a facial challenge [is] a daunting, if not impossible, task." *Id.*, 603 U.S. at 745 (Barrett., J. concurring). On this record, NetChoice cannot carry its heavy burden of establishing that Section 1601 is facially unconstitutional. Where the parties and the Court can only speculate as to how it will be applied across industries and platforms, and what disclosures companies will choose to make, facial relief is unavailable.

## ARGUMENT

**I.     Colorado's social media disclosure law is a constitutional regulation of commercial speech.**

In *Zauderer*, the Supreme Court held that the government may require commercial actors to disclose factual information about their goods and services without violating the First Amendment. 471 U.S. at 651. Under *Zauderer*, compelled disclosures that are "factual" and "uncontroversial" are subject to deferential review and will be upheld if they are (1) reasonably related to a substantial government interest and (2) not unduly burdensome. *Id.*; *see also NIFLA*, 585 U.S. at 768.

The *Zauderer* framework recognizes that "the extension of First Amendment protection to commercial speech is justified principally by the value to consumers

of the information such speech provides." 471 U.S. at 651 (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)). Because the First Amendment interest in commercial speech derives largely from the value of accurate information to consumers, a speaker's "constitutionally protected interest in *not* providing any particular factual information . . . is minimal." *Id.* (emphasis in original). Requiring the disclosure of truthful information therefore advances, rather than undermines, the core First Amendment interests that justify protection for commercial speech. *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001). Courts accordingly apply "a lower level of scrutiny to laws that compel disclosures" of factual and uncontroversial information concerning a company's own products (*Zauderer* scrutiny). *NIFLA*, 585 U.S. at 768.

The Healthier Social Media Use by Youth Act readily satisfies *Zauderer* scrutiny. The law requires social media companies to provide users with factual, research-backed information concerning the health effects of excessive social media use. The district court therefore erred in concluding that the required disclosure was not commercial speech and in subjecting the law to strict scrutiny.

A. **The function required by Section 1601 is a quintessential health and safety product warning and is commercial speech.**

The disclosure required by Section 1601 of the Healthier Social Media Use by Youth Act is a straightforward regulation of commercial speech. The law requires social media companies to provide young users with factual information

concerning the health effects of their own products and services. Courts have long treated such health and safety warnings as commercial speech subject to deferential review under *Zauderer*.

The district court erred in holding that Section 1601 does not regulate commercial speech. It did so in part because the required disclosure does more than "propose a commercial transaction." App. Vol. II at 369. To be sure, such proposals fall within the core of the commercial speech doctrine. *Zauderer*, 471 U.S. at 637 (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978)). But courts have repeatedly recognized that the "boundaries of the commercial-speech category" go beyond this "core" definition. *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014); *see also Zauderer*, 471 U.S. at 637 (observing that "the precise bounds of the category of expression that may be termed commercial speech" remain undefined). Even where it does not appear in an express advertisement, a company's speech describing the attributes, risks, or safe use of its own products is classic commercial speech. *See NIFLA*, 585 U.S. at 775 (holding that *Zauderer* applies to "factual and uncontroversial disclosures about commercial products"); *CTIA- The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 842 (9th Cir. 2019) ("*CTIA II*") (explaining that a disclosure that "relates to the service or product provided" is commercial speech).

16

This Circuit has never limited commercial speech to that which proposes a commercial transaction. Instead, this Circuit employs a "common sense" approach to the commercial speech analysis and recognizes that "[n]o single formulaic test" governs the inquiry. *United States v. Wenger*, 427 F.3d 840, 846–47 (10th Cir. 2005) (citations omitted). The district court recognized this governing authority but nonetheless leaned heavily on the three *Bolger* factors.[2] App. Vol. II at 367-71. This was error. As applied by the district court, those factors would place product safety warnings outside the bounds of commercial speech. That is not the law. *See, e.g.*, *NIFLA*, 585 U.S. at 775 ("[W]e do not question the legality of health and safety warnings long considered permissible, or purely factual and uncontroversial disclosures about commercial products.").

The Ninth Circuit has expressly recognized that product warnings constitute commercial speech regardless of the application of the *Bolger* factors. *See X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024) ("[W]e have characterized the following speech as commercial even if not a clear fit with the Supreme Court's [*Bolger*] articulation: . . . retail product warnings." (citing *CTIA II*, 928 F.3d at 845)). As the Ninth Circuit explained, disclosures that "relate[] to the service or product provided" are commercial speech. *CTIA II*, 928 F.3d at 842. This approach

---

[2] The three *Bolger* factors are: (1) Is the speech "conceded" to be an advertisement? (2) Does the speech "reference . . . a specific product[?];" and (3) Does the speaker have an "economic motivation" for the speech? *Bolger*, 463 U.S. at 66.

accords with the Supreme Court's endorsement of health and safety warnings in *NIFLA*, 585 U.S. at 775.

Cigarette warnings provide the paradigmatic example. Federal law requires tobacco manufacturers to place the Surgeon General's warning not only in advertisements, but directly on cigarette packaging itself. *See, e.g.*, *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 531 (6th Cir. 2012). Courts have long upheld these disclosure laws, concluding that tobacco companies may be compelled to disclose health risks at the point of product use, not merely when proposing a sale. Courts consistently treat such product warnings as commercial speech subject to *Zauderer. See, e.g.*, *R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 875 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 592 (2024) ("*RJRT*") (upholding cigarette packaging health warnings without *Bolger* analysis).

Beyond cigarettes, courts across the country have upheld consumer product and service disclosure regimes under a *Zauderer* commercial speech inquiry. And they have done so without resorting to the *Bolger* factors, including as to mandatory disclosures regarding cell-phone radiation exposure, *CTIA II*, 928 F.3d at 846; mercury-containing products, *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001); country-of-origin labeling on meat products, *Am. Meat Inst. v. USDA*, 760 F.3d 18, 21 (D.C. Cir. 2014); genetically engineered food labeling, *Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 627 (D. Vt. 2015);

18

and firearm-safety pamphlets, *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F.4th 238, 248 (4th Cir.), cert. denied, 145 S. Ct. 152 (2024). "Speech connected with the sale of a good or a service—promoting the product or service, explaining it, or giving warnings about it—is commercial." *Md. Shall Issue, Inc.*, 91 F.4th at 248.

These cases reflect a common principle: disclosures concerning the risks, attributes, or safe use of a company's own products and services are commercial speech. Section 1601 fits well within this settled framework. The law requires covered platforms to provide young users with "information" that helps them "understand the impact of social media on the developing brain and the mental and physical health of youth users." Colo. Rev. Stat. § 6-1-1601(2). The disclosure appears directly on the social media platform itself and concerns the effects of the service being provided. In that respect, it is no different than countless product warnings routinely reviewed as commercial speech and upheld under *Zauderer*.

That social media platforms often provide services without charging users money does not remove the disclosure from the realm of commercial speech. Social media companies operate within a commercial relationship with users, providing services in exchange for users' attention and data, which platforms monetize primarily through targeted advertising. *See Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 280–81 (5th Cir. 2024) (holding that free websites "propose a commercial transaction: They offer pornography in exchange for data; then, they

19

monetize that data, primarily through advertisements. That series of transactions is explicitly commercial[.]") As NetChoice itself acknowledged at the district court, it represents for-profit commercial "businesses" and works to "make the Internet more accessible and useful for both *businesses* and *consumers*." *See* App. Vol. I at 144 (emphasis added).

Social media platforms also routinely communicate with users through terms of service and other disclosures governing the commercial exchange between the platform and the user—for example, by advising consumers that the platform provides services in exchange for the ability to use consumers' personal data to deliver personalized advertisements.[3] Like terms of service, the disclosure required by Section 1601 is speech directed from a business to its consumers that "relate[s] to the service or product provided." *CTIA II*, 928 F.3d at 842. And it is commercial speech because it requires that covered entities provide consumers with accurate information about the goods and services offered.

---

[3] *See, e.g.*, Terms of Service, Meta, § 2 (Jan. 1, 2025), https://perma.cc/DNK7-P6JC ("Instead of paying to use Facebook and the other products and services we offer, by using the Meta Products covered by these Terms, you agree that we can show you personalized ads and other commercial and sponsored content that businesses and organizations pay us to promote on and off Meta Company Products. We use your personal data, such as information about your activity and interests, to show you personalized ads and sponsored content that may be more relevant to you.").

In sum, Section 1601 regulates commercial speech. It requires businesses engaged in a commercial relationship with consumers to provide factual information directly alongside a product, *RJRT*, 96 F.4th at 875, concerning the services or products provided, *CTIA II*, 928 F.3d at 842, in communications between businesses and users with whom they are engaged in profitable commercial relationships, *Md. Shall Issue, Inc.*, 91 F.4th at 248; *X Corp.*, 116 F.4th at 901. The required disclosure therefore falls in the heartland of *Zauderer* commercial speech.

**B.      If widely adopted, the district court's conclusion that Section 1601 does not regulate commercial speech would call into question decades' worth of authority governing health and safety warnings.**

By limiting commercial speech to content that proposes a commercial transaction, App. Vol. II at 369, the district court unduly cabined the constitutional inquiry. In its view, disclosures concerning "the impacts of social media use on minors' mental and physical health" were not "matters of a commercial character." *Id.* The court further reasoned that "the level of scrutiny is properly determined by analyzing the nature of the compelled speech itself," rather than the broader commercial relationship in which the disclosure occurs. *Id*. at 371–72.

The district court then "bolster[ed]" its conclusion by applying the *Bolger* factors, finding that under these factors the required disclosure (1) is not an advertisement; (2) did not refer to a particular product; and (3) is not economically motivated, because social media companies "presumably have an economic

21

incentive *not* to provide the disclosures" insofar as they "would likely *discourage* minors from using their platforms." *Id.* at 370.

Finally, the district court concluded that even considering the disclosures in the broader context of social media platforms, the law regulates fully protected non-commercial speech because the disclosures attach to platforms' content-moderation functions, which the court characterized as inherently expressive. *Id.* at 372–73 (stating that "content moderation is expressive speech in and of itself").

The district court erred in at least two significant respects. First, it adopted an unduly narrow definition of commercial speech that would exclude even traditional product health and safety warnings from *Zauderer's* ambit. Second, it mischaracterized Section 1601 as regulating platforms' content-moderation decisions concerning third-party speech, when the law instead requires covered entities to provide young users with factual, research-backed information about the effects of their own products and services.

As to the first error, courts routinely treat product warnings as commercial speech even though those warnings do not themselves "propose[] a transaction." *Zauderer*, 471 U.S. at 637 (quotation omitted); *see also supra* Part I.A. Product safety warnings qualify as commercial speech because they convey information about the attributes, risks, or safe use of goods and services—and thus about the terms and conditions of a commercial transaction or relationship. *See, e.g., X*

22

*Corp.*, 116 F.4th at 901 ("Though it does not directly or exclusively propose a commercial transaction, [a product warning] communicates the terms of an actual or potential transaction."); *see also Md. Shall Issue, Inc.*, 91 F.4th at 248 (explaining product warnings are commercial because they connect "with the sale of a good or a service.")

A disclosure need not advance the speaker's economic interest to qualify as commercial speech under *Zauderer*. To the contrary, "[p]roduct labeling requirements are traditionally regarded as commercial speech even if they effectively discourage the product's consumption." *Grocery Mfrs. Ass'n*, 102 F. Supp. 3d at 627; *see also N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health,* 556 F.3d 114, 131, 133 (2d Cir. 2009) (holding that required "disclosure of calorie information in connection with a proposed commercial transaction—the sale of a restaurant meal"—is "clearly commercial speech" notwithstanding association's claim that the disclosure required restaurants "to cram calorie information down the throats of their customers") (quotation marks omitted).

In most cases, an industry will claim that attaching a health and safety warning to its products is not in its strict economic interest. *See, e.g. RJRT*, 96 F.4th at 873, 880, 882 (considering, and rejecting, cigarette manufacturer's arguments that product warning "misrepresent[s] or exaggerate[s] the potential effects of smoking," and is "ideological or provocative message," noting "plaintiffs

23

merely dislike the nature of the warnings"). Such objections do not transform product warnings into non-commercial speech.

The district court's contrary reasoning would, if widely adopted, call into question countless disclosure regimes long understood to be constitutional. Product safety warnings concerning cigarettes, alcohol, pharmaceuticals, children's toys, food, and hazardous household goods neither propose a transaction nor advance the speaker's economic interests. Thus, under the district court's analysis, they would all be constitutionally suspect. The Supreme Court has expressly rejected that result, emphasizing that courts "do not question the legality of health and safety warnings long considered permissible, or purely factual and uncontroversial disclosures about commercial products." *NIFLA*, 585 U.S. at 775.

As to the second error, Section 1601 regulates platforms' own speech to users—not their moderation of third-party content. The district court emphasized declarations stating that certain NetChoice members "engage in content moderation." App. Vol. II at 372 (citing App. Vol. I at 148, 161). But that observation has no bearing on the disclosure required here. The function mandated by the Healthier Social Media Use by Youth Act constitutes commercial speech between a platform and its users concerning the effects of the platforms' services. The law does not attach to third-party content, proscribe editorial judgments, or require platforms to alter the algorithms used to deliver third-party content to users.

24

The district court likewise misread *Moody*. There, the Supreme Court explained that "the First Amendment offers protection when an entity engaged in compiling and curating others' speech into an expressive product of its own is directed to accommodate messages it would prefer to exclude." *Moody*, 603 U.S. at 709–10. The laws at issue in *Moody* regulated the manner in which social media platforms selected, prioritized, and presented third-party speech to users. Section 1601 does nothing of the sort. It does not require platforms to host, remove, prioritize, suppress, or otherwise alter third-party content. Nor does it interfere with editorial judgments concerning the curation of others' speech. Instead, Section 1601 requires platforms to provide users with factual, research-backed information concerning the effects of the platforms' own products and services. *Moody* therefore provides no support for treating such disclosures as equivalent to editorial decisions regarding third-party speech.

Based on these errors, this Court should, at a minimum, reverse the district court's conclusion that Section 1601 does not regulate commercial speech. But the Court should also hold that Section 1601 is subject to, and satisfies, *Zauderer*.

## II.     NetChoice cannot carry the heavy burden to support a facial challenge.

The district court erred in concluding that NetChoice was entitled to facial relief. Section 1601 applies to a broad spectrum of social media companies and affords those companies substantial discretion in designing a compliant function.

Against that backdrop, the "strong medicine" of facial relief is inappropriate. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (quotation omitted). A preliminary injunction seeking facial relief even more so. A facial challenge is "the most difficult challenge to mount successfully" in all of constitutional law. *United States v. Salerno*, 481 U.S. 739, 745 (1987). "For a host of good reasons, courts usually handle constitutional claims case by case, not en masse," *Moody*, 603 U.S. at 723. In the social media context, a facial challenge "likely forces a court to bite off more than it can chew." *Id*. at 747 (Barrett, J., concurring). "While the governing constitutional principles are straightforward, applying them in one fell swoop to the entire social-media universe is not." *Id*. at 748 (Barrett, J., concurring). Especially in this context, the Supreme Court has "therefore made facial challenges hard to win." *Id*. at 723.

In a typical facial challenge, a plaintiff must establish that "no set of circumstances exists under which the law would be valid," or that "the law lacks a plainly legitimate sweep." *Id.* (citations omitted). In First Amendment cases, the standard is "less demanding though still rigorous." *Id*. Here, NetChoice must show that "the law's unconstitutional applications substantially outweigh its constitutional ones." *Id*. at 724.

*Moody* establishes a two-part test. First, a court must "assess the state law's scope" to "determine what the law covers." *Id*. at 724–25 (text only). Second, it must decide which of the law's applications are unconstitutional and weigh them against its constitutional applications. *Id*. at 725–26. In the context of social media regulations, this means assessing a law's application to "every covered platform or function." *Id*. at 725.

**A.     The district court appropriately considered NetChoice's challenge as a facial challenge, but misapplied *Moody*'s two-part test.**

The district court correctly analyzed NetChoice's claims as facial challenges. But it erred in granting facial relief. The district court reasoned that the limited preliminary record did not preclude relief because Section 1601's "scope and application are uniform in all material respects" and "regardless of the particular service offered or algorithm employed by a regulated company, [Section 1601] requires *every* covered social media platform to perform the same task under the Act." App. Vol. II at 361–62 (emphasis in original). It therefore concluded that "to the extent [Section 1601] offends the First Amendment, it does so in the same material way across all social media platforms subject to the provisions of the Act." *Id*. at 362. Finally, the court reasoned that, whatever form a covered company's function might take, the law uniformly requires platforms to "convey to minor users Colorado's belief that excessive use of social media may be risky to their health and well-being." *Id*. at 365.

27

By treating all potential functions the same, the court failed to properly identify and balance constitutional applications against unconstitutional applications. Under *Zauderer*, the key questions are whether a compelled disclosure is factual, uncontroversial, and unduly burdensome. Ordinarily, courts answer these questions by analyzing the compelled disclosure's text. *See, e.g.*, *Free Speech Coal., Inc.*, 95 F.4th at 268 & n.5; *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1268 (9th Cir. 2023). But here, Section 1601 does not mandate any specific language. Each covered platform may draft different text tailored to its own service, user, and design. Some disclosures could be factual and uncontroversial; others might not be. Some formats could be minimally intrusive; others might not be. That range of possibilities is constitutionally significant.

Indeed, many potential applications would be plainly constitutional. A platform might, for example, display a brief notice stating: "Research shows that prolonged daily use of social media can disrupt opportunities for exercise and interfere with sleep." Or a platform might provide a periodic time-use notification stating: "Time check! You've been using this app for two hours. Studies show that long periods of social media use can affect the developing brain and body. Taking a break can help you stay physically active and protect your mental health." These examples illustrate the point: The Healthier Social Media Use by Youth Act

28

permits covered companies to comply through factual, research-backed, and minimally burdensome disclosures.

Given that variability, the constitutionality of any given function is best assessed on a case-by-case basis in response to enforcement actions, if any, against covered companies. At minimum, evaluating NetChoice's likelihood of success on a facial challenge required the district court to undertake *Moody*'s second step: assessing Section 1601's application to "every covered platform or function," *Moody*, 603 U.S. at 725, and then weighing the constitutional applications against the unconstitutional ones. The district court failed to do so. Its conclusion that "the flexibility [Section 1601] affords social media companies to select the exact verbiage in the mandatory disclosures is of no constitutional moment," App. Vol. II at 362, misunderstands *Zauderer* and sidesteps *Moody*'s mandate to examine all applications of the law.

**B.      On its face, the function requirement satisfies *Zauderer* scrutiny.**

In the context of a facial challenge, this case presents a simple question: does requiring a social media company to provide young users with research-backed information about the health effects of social media violate that company's First Amendment rights in a substantial number of cases, compared to instances where such a requirement is constitutionally acceptable? This Court should

29

conclude that NetChoice is unlikely to carry its "heavy burden" on this question. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998).

Under *Zauderer*, regulated speech that is "(1) purely factual and (2) uncontroversial" satisfies the First Amendment so long as it is "justified by a legitimate state interest" and "not unduly burdensome." *RJRT*, 96 F.4th at 877. A disclosure is "purely factual" if it requires only "the disclosure of accurate, factual information." *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1276; *see also RJRT*, 96 F.4th at 879 (holding that product warnings are "purely factual" if they "are (1) statements composed of only (a) information supported by facts and (b) conclusions driven by those facts, and (2) not akin to unfalsifiable statements of opinion"). Because a function that complies with the Healthier Social Media Use by Youth Act will be "supported by data from peer-reviewed scholarly articles" or a "mental health and technology resource bank," Colo. Rev. Stat. § 6-1-1601(2), it will be "purely factual."

In *CTIA II*, the Ninth Circuit considered a city ordinance that required cell phone retailers to disclose to customers that "the Federal Government requires that cell phones meet radio-frequency (RF) exposure guidelines" and if a person carries a phone in a pocket, they "may exceed the federal guidelines for exposure to RF radiation." 928 F.3d at 846. That court held that regardless of whether the federal guidelines validly set the "demarcation point of safety for cell phones," the

30

required disclosure correctly described the federal guidelines and thus was "literally true." *Id*. at 846–47 (quotation marks omitted). Here, too, any function referencing scholarly research will be literally true. For example, a company could comply by accurately stating that "The National Academies of Sciences, Engineering, and Medicine, in a study summarizing research on social media and youth users, concluded that the 'displacement of time otherwise given to sleep, exercise, or hobbies, can have consequences for health' such as 'depression and anxiety' or 'day-time sleepiness.'" *See Social Media and Adolescent Health* at 99, https://perma.cc/P4JN-4WTD.

The required disclosures are also uncontroversial. A statement "is 'uncontroversial' for purposes of *Zauderer* where the truth of the statement is not subject to good-faith scientific or evidentiary dispute and where the statement is not an integral part of a live, contentious political or moral debate." *Free Speech Coal., Inc*, 95 F.4th at 281–82 (citing *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 8–9 (1986) and *NIFLA*, 585 U.S. at 769). Neither is the case here.

As for the "good-faith dispute" consideration, neither empirical certainty nor a total absence of scientific disagreement are necessary to justify a product safety warning. For example, in *CTIA II*, the court held that cell phone radiation warnings were factual and uncontroversial even though the cell phone industry contested the magnitude of risk of radiation from a cell phone kept close to a user's body. 928

31

F.3d at 846–47. Here, the General Assembly responded to a growing body of scientific evidence showing that excessive social media use increases the risk of youth health issues, including findings from the U.S. Surgeon General. App. Vol. I at 131–32. Although the Surgeon General's advisory says that "[m]ore research is needed to fully understand the impact of social media," it continues: "however, the current body of evidence indicates that while social media may have benefits for some children and adolescents, there are ample indicators that social media can also have a profound risk of harm to the mental health and well-being of children and adolescents." Surgeon General Advisory at 4, https://perma.cc/D2TM-KHRH.

In addition to the Surgeon General's Advisory, evidence presented at two recent trials has shown that excessive social media use is harmful to children. *See* M. Lee, *Jury finds Meta's platforms are harmful to children in 1st wave of social media addiction lawsuits*, https://perma.cc/4K4U-62DX; M. Cunningham, E. Pandise, *Meta and YouTube found liable on all charges in landmark social media addiction trial*, https://perma.cc/DH97-SLNZ. Those trials included evidence that social media platforms were designed to be addictive, especially to young people, and that Meta's internal research showed that excessive use was common and harmful to young users. These findings, from both research and adversarial court processes, justify safety warnings about the risks of social media overuse.

On the "contentious political or moral debate" element, the Healthier Social Media Use by Youth Act "does not force [social media platforms] to take sides in a heated political controversy." *CTIA II*, 928 F.3d at 848. This alone distinguishes it from *NIFLA*, in which California required clinics to provide information about "abortion, anything but an 'uncontroversial' topic." 585 U.S. at 769. Here, the topic of youth mental health and social media is not categorically "controversial;" NetChoice's own members acknowledge the concern. *See, e.g.*, App. Vol. I at 165 (YouTube declarant noting it "offers a suite of digital wellbeing tools that encourage children and teens to be mindful of their screentime"); *id*. at 179 (Snap declarant stating it "takes steps to safeguard the mental health of its users"); *id*. at 207 (Meta declarant stating it provides "resources and information related to suicide prevention, maintaining mental health and well-being," and other related topics). Here, platforms are required only to accurately describe the consensus research about social media's risks to youth; they are not required to adopt a moral or political view as their own.

Because the functions required by Section 1601 are factual and uncontroversial, they are entitled to *Zauderer* scrutiny. And the functions meet that scrutiny. First, they are reasonably related to a substantial government interest. Informing consumers about a product's risks to children's health and safety is a substantial governmental interest. NetChoice conceded as much below. App. Vol. I

33

at 124 ("[A] State possesses legitimate power to protect children."). And courts have clearly held that "the governmental interest in furthering public health and safety is sufficient under *Zauderer* so long as it is substantial." *CTIA II*, 928 F.3d at 844. Finally, providing youth users with information about the effects of social media use is related to Colorado's interest in protecting the health and safety of young users, a point NetChoice has never contested. *See* App. Vol. II at 244.

Second, the required functions are not unduly burdensome. A statute is unduly burdensome when its compelled disclosures "drown[] out [the speaker's] own message." *NIFLA*, 585 U.S. at 778. Social media companies today are some of the wealthiest companies in the world, capable of holding the attention of billions of users daily. They speak to their users nearly constantly, via notifications, posts on their platforms, advertisements, and traditional media. A brief notification, for a subset of users, triggered only after sufficient time online does not "drown out" platforms' own messages. *See, e.g.*, *Disc. Tobacco City & Lottery, Inc.*, 674 F.3d at 524, 551 (upholding requirement that the top 50% of the front and back of cigarette packaging be reserved for full color, graphic health warnings issued by the FDA.). Moreover, platforms remain free to speak to users about their own views on the health benefits of social media. *See CTIA II*, 928 F.3d at 849 (noting that companies' ability to "add additional information" to the compelled disclosure reduces the burdens imposed by the disclosure law).

A commercial disclosure is neither controversial nor burdensome simply because a regulated company claims it is at odds with its mission. Disagreement alone cannot create controversy sufficient to exempt a product warning from *Zauderer* scrutiny. Tobacco companies, for example, have long disagreed with the safety labels required on their products but "that the speaker does not like the message does not make it controversial; . . . [i]f mere dislike sufficed, Zauderer would have prevailed[.]" *RJRT*, 96 F.4th at 881.[4] Nor does a company's disagreement with a required disclosure make it burdensome. In *Discount Tobacco City*, for example, the plaintiffs argued that large cigarette warnings were burdensome in part because "such significant labels might dissuade certain smokers from buying their product by making it appear unhealthy or otherwise unattractive." 674 F.3d at 531. The Sixth Circuit rejected that argument, noting that the very "purpose of the labels" was "to provide truthful information regarding the health consequences of the product in order to decrease the use of tobacco by young people and dependance on tobacco." *Id*. (quotation omitted).

---

[4] Although the subjective interests of NetChoice's members is irrelevant to the *Zauderer* analysis, NetChoice's statement that Section 1601 is at odds with its members' missions is belied by the admissions of several of those members that they are already providing similar notifications. App. Vol. I at 166–67 (YouTube declarant describing in-app "take a break" and "bedtime" reminders); *id*. at 179 (Snap declarant describing "in-app warnings"); *id*. at 195 (Meta declarant describing "time limit reminders" and "sleep mode").

In short, Colorado's required function meets *Zaunderer* scrutiny on its face. Given this, the function (and its many possible iterations) necessarily survives the *Moody* test for pre-enforcement facial relief. Ultimately, at this stage, and on this record, NetChoice cannot show that the Healthier Social Media Use by Youth Act will require any company, let alone a substantial number, to adopt a function that is not factual and uncontroversial, or that is unduly burdensome. To the contrary, those functions will necessarily be backed by peer-reviewed research or scholarly articles drawn from the social media resource bank, Colo. Rev. Stat. § 6-1-1601(2), and can be crafted by the companies to minimize their burden.

The same is true of an analysis of the functions' level of controversy. The district court erred in concluding that every plausible function is unconstitutional because every platform must "convey to minor users Colorado's belief that excessive use of social media may be risky to their health and well-being." App. Vol. II at 365. Nothing in Section 1601 requires companies to carry a specific message, let alone a message about "Colorado's belief." And even if there were good-faith debates on topics within the broad field of social media and youth mental health (which the Attorney General does not concede), NetChoice has not and cannot show that plausible controversial functions substantially outweigh plausible uncontroversial ones. To the contrary, countless evidence-based,

36

noncontroversial statements will satisfy the statutory standard, including, perhaps, some that companies are already saying. *See supra* n.4.

The undue burden analysis proceeds similarly. On its face, a brief pop-up is a minimal burden on social media companies' ability to speak to their users. And since Section 1601 does not prescribe a single method of displaying the function to users, it should follow that a substantial amount of the possible versions will present little burden on social media companies' speech. Companies remain free to craft the specific messages in their functions and speak to their users in other ways. And such speech can include the companies' own opinions on social media and youth mental health.

## CONCLUSION

At minimum, this Court should reverse the district court's conclusion that Section 1601 does not regulate commercial speech and vacate the preliminary injunction. The Attorney General also respectfully requests that the Court hold that *Zauderer* scrutiny applies and that NetChoice is unlikely to succeed on the merits of its First Amendment claim because the challenged section of the Healthier Social Media Use by Youth Act is likely constitutional on its face.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested because this appeal involves a constitutional challenge to a state statute.

Respectfully Submitted,

PHILIP J. WEISER
Attorney General

/s/ *Lane Towery*

PETER G. BAUMANN*
Assistant Solicitor General
LANE TOWERY*
Assistant Attorney General

Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, Colorado  80203
Telephone:  (720) 508-6000
E-Mail:  peter.baumann@coag.gov
lane.towery@coag.gov
*Counsel of Record
*Attorneys for Philip J. Weiser*

38

## WORD COUNT AND TYPEFACE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) (excluding the items listed under Fed R. App. P. 32(f)) because

    this brief contains 8,321 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

    this brief has been prepared in a proportionally spaced typeface (fourteen-point Times New Roman) using Microsoft Word.

Date: May 11, 2026

          *s/ Lane Towery*
          LANE TOWERY
          Assistant Attorney General