No. 25-1456

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

NETCHOICE,

*Plaintiff-Appellee,*

v.

PHILIP J. WEISER, in his official capacity
as Attorney General of the State of Colorado,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Colorado, Case No. 25-cv-02538-WJM-KAS
Honorable William J. Martinez Presiding

**BRIEF OF *AMICI CURIAE***
**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION,**
**AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL**
**LIBERTIES UNION FOUNDATION OF COLORADO,**
**ELECTRONIC FRONTIER FOUNDATION, AND WOODHULL**
**FREEDOM FOUNDATION**
**IN SUPPORT OF APPELLEE AND AFFIRMANCE**

Cody Venzke
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
915 15th St. NW
Washington, DC 20005
Email: cvenzke@aclu.org
Tel.: (202) 457-0800
*Licensed only in California.*
*Application pending in the*
*District of Columbia.*

D Gill Sperlein
  *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave, SE, Ste. 340
Washington, DC 20003
Email: gill.sperlein@fire.org
Tel.: (215) 717-3473

Counsel for *Amici Curiae*

*Additional counsel listed inside front cover*

Vera Eidelman
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18 Fl.
New York, NY  10004
Email: veidelman@aclu.org
Tel.: (212) 549-2500

Timothy R. Macdonald
Sara R. Neel
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
        OF COLORADO
303 E. 17th Avenue, Suite 350
Denver, CO  80203
Email: tmacdonald@aclu-co.org
Email: sneel@aclu-co.org
Tel.: (720) 402-3107

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29(a)(4)(A), counsel for *amici curiae* certifies that (1) *amici* do not have any parent corporations; and (2) no publicly held corporations hold 10 percent or more of the stock or of any ownership interest in *amici*.

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF AUTHORITIES.................................................................iii

INTEREST OF *AMICI CURIAE* ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................ 4

ARGUMENT ................................................................................. 9

I.      HB 24-1136's Disclosure Requirement Unconstitutionally Compels Speech. ................................................................... 9

      A.      HB 24-1136 compels speech. ................................. 10

      B.      Longstanding precedent prevents Colorado from compelling speech. ........................................... 12

II.    The Compelled Speech Colorado Requires Does Not Fall Within *Zauderer*'s Allowance of Commercial Disclosures. ........... 15

      A.      Social media does not constitute commercial speech subject to *Zauderer*. .......................................... 15

      B.      HB 24-1136 would be unconstitutional even under *Zauderer* because the required disclosures are far from "purely factual and uncontroversial." ................................... 22

III.   The District Court Appropriately Granted Facial Relief. ............. 25

IV.   Left Unchecked, HB 24-1136 Will Incentivize Other States to Attempt to Conscript Private Speakers. ....................................... 28

CONCLUSION ................................................................... 30

CERTIFICATE OF COMPLIANCE ....................................... 32

CERTIFICATE OF SERVICE ........................................... 33

# TABLE OF AUTHORITIES

**Cases**

*303 Creative, LLC v. Elenis,*
  600 U.S. 570 (2023) ................................................................ 12

*44 Liquormart v. Rhode Island,*
  517 U.S. 484 (1996) ................................................................ 14

*Am. Ass'n of Pol. Consultants, Inc., v. FCC,*
  923 F.3d 159 (4th Cir. 2019) ........................................... 26–27

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
  760 F.3d 18 (D.C. Cir. 2014) ................................................. 18

*Ashcroft v. Free Speech Coal.,*
  535 U.S. 234 (2002) ................................................................ 27

*Bd. of Trs. of State Univ. of N.Y. v. Fox,*
  492 U.S. 469 (1989) ................................................................ 16

*Bolger v. Youngs Drug Prods. Corp.,*
  463 U.S. 60 (1983) ................................................ 17, 20–21

*Book People v. Wong,*
  91 F.4th 318 (5th Cir. 2024) ........................................... 24, 29

*Brown v. Ent. Merchants Ass'n,*
  564 U.S. 786 (2011) ............................... 7–8, 19, 26–27

*Chiles v. Salazar,*
  146 S. Ct. 1010 (2026) ................................................ 5–6, 14

*CTIA-The Wireless Ass'n v. City of Berkeley,*
  873 F.3d 774 (9th Cir. 2017) ................................................. 14

*CTIA-The Wireless Ass'n v. City of Berkeley,*
  928 F.3d 832 (9th Cir. 2019) ................................................. 18

*Ent. Software Ass'n v. Blagojevich,*
  469 F.3d 641 (7th Cir. 2006) ................................................. 19

*Erznoznik v. Jacksonville,*
  422 U.S. 205 (1975) ...................................................................... 7

*Free Speech Coal., Inc. v. Paxton,*
  606 U.S. 461 (2025) ............................................................... 3, 19

*Free Speech Coal., Inc. v. Paxton,*
  95 F.4th 263 (5th Cir. 2024) .................................... 18–19, 29

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
  515 U.S. 557 (1995) .................................................................... 13

*James v. Meow Media, Inc.,*
  300 F.3d 683 (6th Cir. 2002) .................................................. 19

*Janus v. AFSCME, Council 31,*
  585 U.S. 878 (2018) .................................................................... 12

*Johnson v. United States,*
  576 U.S. 591 (2015) .................................................................... 28

*Joseph Burstyn, Inc. v. Wilson,*
  343 U.S. 495 (1952) .................................................................... 16

*Maryland Shall Issue, Inc. v. Anne Arundel Cnty.,*
  91 F.4th 238 (4th Cir.) .............................................................. 18

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ....................................... 2, 9, 17, 25–26

*Nat'l Ass'n of Mfrs. v. SEC,*
  800 F.3d 518 (D.C. Cir. 2015) ............................................... 22

*Nat'l Ass'n of Wheat Growers v. Bonta,*
  85 F.4th 1263 (9th Cir. 2023) ............................................ 7, 9

*Nat'l Fed'n of the Blind of Colo., Inc. v. Norton,*
  981 F. Supp. 1371 (D. Colo. 1997) ....................................... 14

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
  585 U.S. 755 (2018) .............................................................. 14–15

*NetChoice, LLC v. Bonta,*
   113 F.4th 1101 (9th Cir. 2024)............................................ 8, 20–22, 30

*NetChoice, LLC, v. Murrill,*
   812 F. Supp. 3d 594 (M.D. La. 2025).................................................. 19

*N.Y. Times v. Sullivan,*
   376 U.S. 254 (1964) ........................................................................... 16

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
   475 U.S. 1 (1986) ............................................................................... 13

*Proctor & Gamble Co. v. Haugen,*
   222 F.3d 1262 (10th Cir. 2000) ......................................................... 17

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ........................................................................... 26

*Riley v. Nat'l Fed'n of the Blind of N.C.,*
   487 U.S. 781 (1988) ....................................................................... 21–22

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) ............................................................................. 6

*Secretary of State of Maryland v. Joseph H. Munson Co, Inc.,*
   467 U.S. 947 (1984) ....................................................................... 27–28

*Smith v. California,*
   361 U.S. 147 (1959) ........................................................................... 16

*Turner Broad. Sys., Inc. v. FCC,*
   512 U.S. 622 (1994) ........................................................................... 13

*United States v. United Foods, Inc.,*
   533 U.S. 405 (2001) ........................................................................... 22

*United States v. Wenger,*
   427 F.3d 840 (10th Cir. 2005) ........................................................... 17

*Volokh v. James,*
   148 F.4th 71 (2d Cir. 2025) ................................................................. 1

*Volokh v. James*,
  656 F. Supp. 3d 431 (S.D.N.Y. 2023) ................................................. 29

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ............................................................. 9, 12

*Winter v. G.P. Putnam's Sons*,
  938 F.2d 1033 (9th Cir. 1991) ............................................... 20

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ................................................................ 6

*X Corp. v. Bonta*,
  116 F.4th 888 (9th Cir. 2024)................................... 20–21, 24

## Statutes

Colo. HB 24-1136 .......................... 5–6, 8–11, 13, 15–16, 19–22, 25, 28, 30

Colo. Rev. Stat.
  § 22-2-127 ....................................................................... 10
  § 6-1-1601 .................................................................. 5–6, 11

## Other Authorities

Carol Vidal & Jennifer Maragaret Katzenstein,
  *Social Media and Mental Health in Children and Teens*, JOHNS
  HOPKINS MEDICINE (Sept. 25, 2024) ................................. 23

Carol Vidal et al,
  *The Role of Social Media Use and Associated Risk and Protective
  Behaviors on Depression in Youth Adults: A Longitudinal and
  Network Perspective*, 23 INT'L J. MENTAL HEALTH & ADDICT.
  3672–88 (2025)................................................................... 23

Daphne Keller,
  *Platform Transparency and the First Amendment,* 4 J. FREE
  SPEECH L. 1 (2023) ............................................................ 19

Emily O'Day & Richard Himberg,
*Social Media Use, Social Anxiety, And Loneliness: A Systematic Review*, 3 COMPUTS. IN HUM. BEHAV., art. 100070 (2021)....................23

Kaitlyn Tiffany,
*What if It's Not the Phones?*, THE ATLANTIC (July 9, 2026) .................24

## INTEREST OF *AMICI CURIAE*[1]

**The Foundation for Individual Rights and Expression** ("**FIRE**") is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide without regard to the speakers' views through public advocacy, strategic litigation, and *amicus curiae* filings in cases implicating expressive rights. *See, e.g., Stanford Daily Publ'g Corp. v. Rubio*, 820 F. Supp. 3d 974 (N.D. Cal. 2026) (counsel); *Reges v. Cauce*, 162 F.4th 979 (9th Cir. 2025) (counsel); Brief of FIRE *et al.*, as *Amicus Curiae* Supporting Plaintiffs-Appellants, *Utah Pol. Watch, Inc. v. Musselman*, No. 25-4124, 2026 WL 1872132 (10th Cir. June 30, 2026).

FIRE's work includes litigating to protect expressive rights in the digital realm, ensuring courts apply and extend First Amendment protections consistently to emerging technologies. *See, e.g., Volokh v. James*, 148 F.4th 71 (2d Cir. 2025), *certified question answered*, --- N.E.3d

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund this brief's preparation or submission. All parties consent to the filing of this brief.

----, 2026 N.Y. Slip. Op. 03913 (June 23, 2026) (counsel); Brief of FIRE *et al.* as *Amici Curiae* Supporting Petitioners, *TikTok Inc. v. Garland*, 604 U.S. 56 (2025) (Nos. 24-656 and 24-657); Brief of FIRE as *Amicus Curiae* Supporting Respondents, *Moody v. NetChoice*, LLC, 603 U.S. 707 (2024) (Nos. 22-277 and 22-555); Brief of FIRE as *Amicus Curiae* Supporting Respondents, *Murthy v. Missouri*, 603 U.S. 43 (2024) (No. 23-411). Particularly relevant here, FIRE opposes unconstitutional government efforts to restrict speech on social media and has participated as either counsel or *amicus* in virtually every case challenging unconstitutional attempts to regulate social media such as the one at bar.[2]

**The American Civil Liberties Union** ("ACLU") is a nationwide, nonpartisan, nonprofit organization. **The American Civil Liberties**

---

[2] *NetChoice, LLC v. Bonta*, 170 F.4th 744 (9th Cir. 2026) (*Bonta II*) (counsel); *Students Engaged in Advancing Texas v. Paxton*, 765 F. Supp. 3d 575 (W.D. Tex. 2025), *appeal docketed* No. 25-50096 (5th Cir. Feb. 11, 2025) (counsel); *Zoulek v. Hass*, No. 2:24-CV-00031-RJS-CMR, 2024 WL 3650645 (D. Utah Aug. 5, 2024) (counsel); Brief of FIRE *et al.* as *Amici Curiae* Supporting Petitioners, *NetChoice, LLC v. Fitch*, 145 S. Ct. 2658 (2025); Brief of FIRE as *Amicus Curiae* Supporting Appellants, *Commonwealth v. Meta Platforms, Inc.*, 497 Mass. 384, 277 N.E.3d 166 (2026); Brief of FIRE as *Amicus Curiae* Supporting Plaintiff-Appellant, *NetChoice, LLC v. Yost*, No. 25-3371, 2026 WL 1758907 (6th Cir. June 18, 2026).

**Union Foundation of Colorado** ("ACLU of Colorado") is a state affiliate of the ACLU. Both organizations are dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including freedom of speech. They frequently advocate for First Amendment rights online, *see, e.g., Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); Brief of ACLU *et al.* as *Amici Curiae* Supporting Petitioner, *Packingham v. North Carolina*, 582 U.S. 98 (2017) (No. 15-1194) (amicus), *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025) (counsel), and the free speech rights of young people, see, e.g., *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021) (counsel); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (counsel).

**The Electronic Frontier Foundation** ("**EFF**") is a non-profit civil liberties organization with more than 30,000 active members that has worked for 35 years to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for both in courts and legislatures across the country. EFF has challenged laws that burden internet users' rights to speak and access information online. *See, e.g., ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa.1996) (serving

3

as plaintiff challenging the Communications Decency Act); *ACLU v. Reno*, 31 F. Supp. 2d 473 (E.D. Pa. 1999) (serving as plaintiff challenging the Child Online Protection Act).

The **Woodhull Freedom Foundation** ("**Woodhull**") is a non-profit organization that has worked for decades to advance the recognition of sexual freedom, gender equality, and free expression. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. Woodhull has participated in litigation as a party or amicus in cases across the country involving freedom of speech. Woodhull is particularly focused on governmental attempts to censor, burden access to, or compel online speech, as sexually themed expression is often a target of such efforts.

4

## INTRODUCTION AND SUMMARY OF ARGUMENT

Colorado HB 24-1136 compels social media platforms to convey the State of Colorado's contested view that social media—and the speech it carries—harms minors' health. As the Supreme Court recently admonished in striking down a different Colorado law that the State viewed "as essential to public health and safety," even when the government's goal is well-meaning, "the First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country." *Chiles v. Salazar*, 146 S. Ct. 1010, 1029 (2026).

This shield applies with particular force where, as here, the State not only compels speech from private actors who would prefer not to opine on a topic, but requires them to voice the government's favored message. Section 4 of Colorado House Bill 24-1136, codified at Colo. Rev. Stat. section 6-1-1601 ("HB 24-1136"), mandates that whenever a social media user attests to being under 18, social media platforms must either display full-screen pop-ups or provide them a "function" that offers information about "the impact of social media on the developing brain, and the mental and physical health of youth users." Colo. Rev. Stat. § 6-1-1601(1), (2), and (5). Platforms can parrot "sample messaging" drafted by the

5

government, *id.* § 6-1-1601(5), or select from peer-reviewed scholarly articles or state pre-approved materials. *Id.* § 6-1-1601(1)(a), (2), and (5). Either way, publishers, distributors, and speakers must regularly remind young people that reading, communicating, and creating information on social media may harm them.

As the district court correctly held, this violates the well-settled rule that the government cannot force a private speaker "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). When the government "seeks to dictate what particular 'opinion or perspective' individuals may express on that subject, 'the violation of the First Amendment is all the more blatant.'" *Chiles*, 146 S. Ct. at 1021 (*quoting Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Accepting the parties' agreement that HB 24-1136 compels speech, the district court "conclude[d] that NetChoice is likely to show that Section 4 of the Act fails to satisfy the demanding strict scrutiny standard prescribed by the First Amendment" as required here. App. 354.

That HB 24-1136 seeks to protect children does not alter the analysis. Outside the limited category of speech that is obscene as to

minors, which is not relevant here, speech "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. Jacksonville*, 422 U.S. 205, 213–14 (1975). Yet, generation after generation, well-meaning legislatures have sought to protect children from the bogeyman of the day, whether it be dime novels and penny dreadfuls in the 1800s, motion pictures in the early twentieth century, or radio dramas, comic books, television, and music lyrics later that century. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 797–98 (2011). And courts have nearly universally rejected those restrictions under principles that apply as equally to compelling speech in the name of protecting children as they do to restricting it. *See Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023).

Right on cue, legislatures now compete to neutralize today's perceived threat: social media. Whether those efforts take the form of direct restrictions on minors' access or government-mandated scripts about the harms of social media, they violate the First Amendment.

Colorado argues that the mandated disclosures are commercial speech, and thus receive and survive less rigorous scrutiny. AOB 14–21.[3] But speech does not become commercial merely because it is uttered by a commercial entity, concerns products or services, or is motivated by profit. To the contrary, courts have long subjected compelled warning labels about speech—that is, "speech about speech"—to more rigorous scrutiny, even when the underlying speech is sold for profit. *See, e.g., Brown*, 564 U.S. at 794 (applying strict scrutiny to reject state-mandated label for violent video games). Unlike warning labels about the dangers of consumer products like cigarettes, pharmaceuticals, or hazardous cleaning products, warning labels about speech would force speakers, publishers, and distributors to communicate the government's view that the speech itself is harmful. Even if HB 24-1136 were understood to compel only commercial speech, forcing speech-based platforms "to opine on potential harm to children" from the protected speech the platforms publish is anything but "purely factual and uncontroversial." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117, 1120 (9th Cir. 2024) ("*Bonta I*").

---

[3] In this brief, AOB refers to Appellants' Opening Brief; App. refers to Weiser's Appendix.

Because Section 4 of HB 24-1136 is unconstitutional in all its applications—compelling all social media companies to voice Colorado's contested position that social media and the speech it carries are bad for kids—it is properly subject to facial invalidation. *See Moody*, 603 U.S. at 723 (citation omitted). This Court should affirm the decision below and join courts nationwide in sending a clear message: When legislatures wish to warn users about harms they believe to be associated with social media, they cannot conscript private speakers to be their mouthpieces.

## ARGUMENT

**I.    HB 24-1136's Disclosure Requirement Unconstitutionally Compels Speech.**

If the First Amendment protects anything, it protects the right of speakers to express themselves in ways the government dislikes—and to do so without first reciting a state-mandated message. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). HB 24-1136 violates that right. As the Supreme Court "has long held," the "right to speak and the right to refrain from speaking are complimentary [sic] components of free speech principles." *Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1275 (quoting *Wooley*, 430 U.S. at 705) (internal quotation marks omitted).

9

## A.    HB 24-1136 compels speech.

HB 24-1136 compels social media platforms to publish the state's message that social media harms minors. The law offers two paths to compliance, but no matter which alternative a platform chooses, it is compelled both to speak on a subject on which it may prefer to stay silent and to convey a state-prescribed view on that subject.

The first option under HB 24-1136 is for social media platforms to "establish a function" that provides users with information about "the impact of social media on the developing brain, and the mental and physical health of youth users." §§ 1601(1)(a); 1601(2). The information must come either from "peer-reviewed" scholarship or a "mental health and technology resource bank" maintained by the Department of Education, consisting of materials the "department finds reliable." Colo. Rev. Stat. § 22-2-127.8 (1).

The second way a social media platform can fulfil HB 24-1136's mandatory disclosure requirement is to "create a function" that:

> Displays a pop-up or full screen notification to a
> user who attests to being under the age of eighteen
> when the user:

10

> > (I) Has spent one cumulative hour on the social media platform during a twenty-four-hour period; or
> >
> > (II) Is on a social media platform between the hours of 10 p.m. and 6 a.m.

§ 1601(1)(b). The function "must repeat at least every thirty minutes after the initial notification." § 1601(3). Remarkably, HB 24-1136 does not state what these screen notifications must convey, though the state's Chief Information Officer is tasked with "provid[ing] sample messaging for the content of the notification." § 1601(5). The vagueness inherent in this requirement, coupled with the appearance of a government-mandated right answer, only compounds the constitutional problem.

By mandating publication of these controversial and disputed messages, Colorado forces websites—including many who do not want to "pick a side in the highly contentious and unsettled scientific debate about the 'impact of social media on the developing brain and the mental and physical health of young users'"—to speak. App. 181. Indeed, it forces them to voice Colorado's state-selected view that their lawful expression is harmful to minors' health. Decades of First Amendment precedent prevents Colorado from doing so.

11

### B.    Longstanding precedent prevents Colorado from compelling speech.

"No government … may affect a speaker's message by forcing her to accommodate other views," including—especially—the government's, "and no government may interfere with her desired message." *303 Creative, LLC v. Elenis*, 600 U.S. 570, 596 (2023) (citation omitted). More than eighty years ago, the Supreme Court identified the First Amendment's bar against compelled speech as the "fixed star" in "our constitutional constellation," holding that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Barnette*, 319 U.S. at 642. "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command[.]" *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892 (2018).

It is thus well established that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714. "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas

12

and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). The government "may not compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

"Government action that … requires the utterance of a particular message favored by the Government … pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys., Inc.*, 512 U.S. at 641. Colorado's HB 24-1136 violates this long-standing precedent. Forcing social media platforms to "establish functions" to provide state selected information takes away "the choice of what not to say." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 15–16 (1986) (holding government could not compel utility company to carry speech of others in its billing envelope).

Of course, if the government has something to say about social media use by young people, it is free to do so. Needless to say, "Colorado could itself publish or otherwise publicize" its particular views on social

13

media, "thereby educating the public without burdening the free speech rights" of private speakers like those before this Court. *Nat'l Fed'n of the Blind of Colo., Inc. v. Norton*, 981 F. Supp. 1371, 1374 (D. Colo. 1997). But the State may not force others to mouth its preferred message. "The government is not allowed to compel disclosures to shape consumer behavior to its own design." *CTIA-The Wireless Ass'n v. City of Berkeley*, 873 F.3d 774, 777 (9th Cir. 2017) ("*CTIA I*") (Wardlaw, J., dissenting from denial of rehearing en banc) (mem.) (citing *44 Liquormart v. Rhode Island*, 517 U.S. 484, 507 (1996)).

The dangers associated with compelled speech are present even when the government believes public health is at stake. As the Supreme Court recently affirmed, "the dangers associated with censorship … are no less acute in the fields of medicine and public health than they are anywhere else." *Chiles*, 146 S. Ct. at 1024–25 (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767, 771 (2018)) (internal quotation marks omitted). To the contrary, "[h]istory is littered with examples of official [public health] efforts" that are "designed to increase state power … and muzzle unpopular ideas." *Id.* Even in the context of public health, "the people lose when the government is the

one deciding which ideas should prevail." *NIFLA*, 585 U.S. at 772.

To prevent Colorado from coercing speakers to parrot its preferred views, this Court should affirm the district court's conclusion that HB 24-1136 unconstitutionally compels speech.

## II. The Compelled Speech Colorado Requires Does Not Fall Within *Zauderer*'s Allowance of Commercial Disclosures.

Colorado cannot save HB 24-1136 by invoking *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985). To be sure, *Zauderer* recognizes a limited exception to the longstanding rule against compelled speech, but it extends only to compelled commercial speech of "purely factual and uncontroversial information" that is not unduly burdensome to convey. *Id.* at 651. Despite Colorado's contentions, the speech at issue is not commercial and, even if it were and *Zauderer* applied, the warning labels would nonetheless fail as they are not "purely factual and uncontroversial."

### A. Social media does not constitute commercial speech subject to *Zauderer*.

Colorado argues that social media constitutes commercial speech subject to *Zauderer* for two reasons, but both fail. First, the state focuses on the for-profit nature of social media companies, arguing that, because "[s]ocial media companies operate within a commercial relationship with

users, providing services in exchange for users' attention and data, which platforms monetize primarily through targeted advertising," HB 24-1136 compels commercial speech. AOB 19, 21. But the fact that speech is sold, monetized, or even motivated by profit does not make it commercial. In *New York Times v. Sullivan*, the Supreme Court rejected the idea that an ad about police abuse was commercial because "the Times was paid for publishing the advertisement." 376 U.S. 254, 266 (1964). That, the Court explained, was "as immaterial in this connection as is the fact that newspapers and books are sold." *Id.* So, too, for movies. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02 (1952). And for social media. "Speech for a profit" is not "what defines commercial speech." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989).

Equally, when it comes to distributing or publishing the speech of others, it is "of course no matter that the dissemination takes place under commercial auspices. Certainly a retail bookseller plays a most significant role in the process of the distribution of books." *Smith v. California*, 361 U.S. 147, 150 (1959) (internal citation omitted)); *accord Joseph Burstyn, Inc.*, 343 U.S. at 499 (same for film distribution). That social media involves new mediums and new technologies does not

16

change this result. *See, e.g.*, *Moody*, 603 U.S. at 716–17 ("[W]hile much about social media is new, the essence … is something this Court has seen before.").

Second, Colorado attempts to sidestep these well-established protections by pivoting to its argument that purported "health warnings" are "commercial" by definition, regardless of how they fare under the factors the Supreme Court articulated for identifying "commercial" speech in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983).[4] But this Court has recognized that although "[n]o single formulaic test" controls whether speech is "commercial," the *Bolger* factors "help illuminate the issue." *United States v. Wenger*, 427 F.3d 840, 847 (10th Cir. 2005); *accord Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1274 (10th Cir. 2000).

---

[4] The three *Bolger* factors are whether speech (1) is an advertisement, (2) references a specific product, and (3) is motivated by the speaker's economic interest. 463 U.S. at 66–67. By themselves, none of these factors is dispositive, but "[t]he combination of all these characteristics … provides strong support" for a "conclusion that the [speech is] properly characterized as commercial." *Id.* at 67 (emphasis deleted).

The cases Colorado cites in its effort to create a carveout for health warnings deal almost exclusively with disclosures on product packaging or at the point of sale, such as "safety warnings concerning cigarettes, alcohol, pharmaceuticals, children's toys, food, and hazardous household goods." AOB 24; *id.* at 18–19. Such disclosures about nonspeech, commercial products, tied directly to sale, are supported by a "long history" of mandated labeling on commercial products. *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 25 (D.C. Cir. 2014); *see, e.g.*, *Maryland Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F.4th 238, 248 (4th Cir.), *cert. denied*, 145 S. Ct. 152 (2024) (firearms "at the point of sale"); *CTIA-The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 838 (9th Cir. 2019) ("*CTIA II*") (cellphone sales).

But these traditional product labels are categorically different from the speech labels at issue here: warning labels on and about protected speech. Colorado has not identified *any* case upholding a statute that requires speakers to affix a warning to fully constitutionally protected speech regarding the speech itself.[5] That is hardly surprising, as courts

---

[5] *Free Speech Coalition v. Paxton*, the sole case Colorado cites as holding that a mandated label on speech is "commercial," cannot save the state's law. In *Free Speech Coalition*, the Fifth Circuit held that a

have rejected analogous efforts to compel "speech about speech," including when that speech is sold for profit.[6] *E.g.*, *Brown*, 564 U.S. at 794 (rejecting state-mandated label for violent video games); *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 643 (7th Cir. 2006) (applying strict scrutiny for labels for "sexually explicit" video games); *cf. James v. Meow Media, Inc.*, 300 F.3d 683, 701 (6th Cir. 2002) (declining to extend products liability to "ideas and images"); *Winter v. G.P. Putnam's Sons*,

---

regulation of website landing pages for adult content governed commercial speech because, unlike HB 24-1136, the law "focus[ed] on business and corporate forms." 95 F.4th 263, 280 (5th Cir. 2024) (emphasis original), *aff'd on other grounds*, 606 U.S. 461 (2025). *Free Speech Coalition* is further distinguishable in that the speech for which the law would have required labels was unprotected with respect to minors, *id.* at 280–81 & n.56, which cannot be said of social media, *NetChoice, LLC, v. Murrill*, 812 F. Supp. 3d 594, 646 (M.D. La. 2025) ("Texas law that restricted access to speech that is unprotected for minors (i.e., pornography)" was "not analogous to" age verification requirements for social media access (emphasis deleted)). And, as detailed below, even after determining that the warning labels compelled only commercial speech, including about speech that is not protected as to minors, the Fifth Circuit nevertheless enjoined the health warning labels because they failed *Zauderer*'s "purely factual and uncontroversial" requirement, *Free Speech Coal.,* 95 F.4th at 282, just as the disclosures here do. *See supra* 23–24.

[6] Daphne Keller, *Platform Transparency and the First Amendment,* 4 J. FREE SPEECH L. 1, 47 (2023) (describing state-mandated warning labels on videogames and other "speech about speech").

938 F.2d 1033, 1037–38 (9th Cir. 1991) (declining to impose liability for failure to apply warning label to instruction manual).

Many of the courts rejecting application of *Zauderer* scrutiny to such labels turned to the *Bolger* factors to bolster their analysis, contravening Colorado's insistence that compelled "health warnings" are commercial by definition. For example, the Ninth Circuit applied strict scrutiny to a law that, much like HB 24-1136, required online platforms to "opine on … the risk that children are exposed to harmful content online." *Bonta I*, 113 F.4th at 1119. Citing the *Bolger* factors, the court held the mandated impact assessments did not involve commercial speech, because they are "not advertisements." *Id.* at 1120 (citing *Bolger*, 463 U.S. at 67). Rather, "they require businesses to go beyond opining about their products or services to opine on highly controversial issues of public concern," and platforms "do not have a clear economic motivation to provide these opinions or perform this state-required censorship." *Id.*

The Ninth Circuit also pointed to the *Bolger* factors in holding that a law requiring social media companies to create reports analyzing their content moderation policies likely compelled non-commercial speech. *X Corp. v. Bonta*, 116 F.4th 888, 901–02 (9th Cir. 2024). The court applied

20

strict scrutiny to the requirement because the reports did not "directly or exclusively propose a commercial transaction" or "communicate[] the terms of an actual or potential transaction." *Id.* at 901.

As in *Bonta I* and *X Corp.*, Colorado's proposed warnings lack the hallmarks of commercial speech identified in *Bolger*. Neither the social media platforms themselves nor the warning labels are advertisements; neither refers to a specific product, and the warning labels refer to purported harms from "social media" writ large, not any particular platform, technological tool, or feature. Although social media platforms have an economic incentive to publish, that alone cannot convert the platforms into commercial speech, for the reasons stated above.[7]

---

[7] Applying the *Bolger* factors also raises a question the district court addressed but with which Colorado does not grapple: "In deciding which level of scrutiny to apply, [should] the Court … look to the compelled speech itself, or rather to the speech in which covered entities engage?" App. 370–71 n.5. The district court noted many courts of appeals have analyzed the nature of the *compelled* speech, often without discussion, but it chose to apply the analysis to both the compelled warning labels and the speech "in which social media platforms typically engage," finding HB 24-1136 impermissible under either approach. App. 371–72. Although not dispositive, *amici* believe the analysis correctly focuses not on the nature of the *compelled* speech, but on the speech to which it is affixed.

In *Zauderer* itself, the Supreme Court analyzed the commercial nature of the attorney ads at issue, not the message the state sought to compel. 471 U.S. at 651. And in *Riley v. National Federation of the Blind*

21

### B.    HB 24-1136 would be unconstitutional even under *Zauderer* because the required disclosures are far from "purely factual and uncontroversial."

Even if HB 24-1136 were understood to implicate only commercial speech, it would still be unconstitutional under *Zauderer*, because forcing speech-based platforms "to opine on potential harm to children" from protected speech is anything but "purely factual and uncontroversial." *See, e.g., Bonta I,* 113 F.4th at 1117, 1120. HB 24-1136 requires platforms to warn users about the impact of social media on the health of minors. That topic is complex and currently hotly debated including within the peer-reviewed literature Colorado would have social media platforms summarize.

For example, researchers at Johns Hopkins found both that social media use carries benefits for minors, and that it correlates with negative

---

*of North Carolina* the Court observed: "It is not clear that a professional's speech is necessarily commercial …. Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." 487 U.S. 781, 795–96 (1988). That means the analysis focuses on the nature of the speech subject to a compelled disclosure, not the disclosure itself. *Cf. Nat'l Ass'n of Mfrs. v. SEC,* 800 F.3d 518, 522–23 (D.C. Cir. 2015) (holding *Zauderer* inapplicable to disclosures "unconnected" to "voluntary advertising" or "product labeling at the point of sale" (discussing *United States v. United Foods, Inc.,* 533 U.S. 405 (2001)).

mental health experiences, such as social isolation—but that "many risk factors, including a genetic predisposition, aspects of the surrounding environment and personal experiences, which are not so directly related to social media use patterns" can explain those negatives.[8] Similarly, a 2021 literature review found that "[o]nly a few studies have examined the directional relationship between social anxiety and problematic [social media use (SMU)]," with some studies finding preexisting social anxiety predicted maladaptive SMU, others finding the inverse, and yet others finding no significant predictive power.[9] Forcing speakers to wade into such areas of debate, where scientific inquiry remains unsettled, is exactly what *Zauderer* forecloses.

The Fifth Circuit recently rejected warning labels in two cases that are relevant here for precisely that reason. First, in *Free Speech Coalition*

---

[8] Carol Vidal & Jennifer Maragaret Katzenstein, *Social Media and Mental Health in Children and Teens*, JOHNS HOPKINS MEDICINE (Sept. 25, 2024) https://perma.cc/RP59-NQU4; *accord* Carol Vidal et al, *The Role of Social Media Use and Associated Risk and Protective Behaviors on Depression in Youth Adults: A Longitudinal and Network Perspective*, 23 INT'L J. MENTAL HEALTH & ADDICT. 3672–88 (2025), https://perma.cc/BC4T-SRZA.

[9] Emily O'Day & Richard Himberg, *Social Media Use, Social Anxiety, And Loneliness: A Systematic Review*, 3 COMPUTS. IN HUM. BEHAV., art. 100070 (2021), https://perma.cc/Z2A7-9JQE.

*v. Paxton*, the court held compelled health warnings on adult websites failed *Zauderer* because they were not uncontroversial. 95 F.4th at 282. As the Fifth Circuit explained, for compelled speech to fail *Zauderer* because it is "controversial" requires "only … some widespread, good-faith dispute over the topic or the facts." *Id.*; *accord X Corp.*, 116 F.4th at 901–02. In *Free Speech Coalition*, expert testimony suggested that there was "no generally accepted, peer-reviewed research studies … that viewing adult-oriented erotic material causes physical, neurological, or psychological damage such as 'weakened brain function' or 'impaired brain development.'" 95 F.4th at 282. Rather, debate among experts established the issue was "currently too contentious and controversial to receive *Zauderer* scrutiny." The same is true of social media, mental health, and youth brain development.[10]

Similarly, in *Book People v. Wong*, the Fifth Circuit held that a law passed to "protect[ ] children from harmful library materials" by requiring school book vendors to "issue sexual-content ratings" violated

---

[10] See, e.g., Kaitlyn Tiffany, *What if It's Not the Phones?*, THE ATLANTIC (July 9, 2026), https://perma.cc/5FM3-X3KL.

the First Amendment because the ratings were "neither factual nor uncontroversial." 91 F.4th 318, 324, 340–41 (5th Cir. 2024). "[R]equir[ing] vendors to undertake contextual analyses" and "[b]alanc[e] a myriad of factors that depend on community standards is anything but the mere disclosure of factual information. And it has already proven controversial." *Id.* at 340. The same is true of warning labels that must opine on the health risks of social media use for minors.

## III.   The District Court Appropriately Granted Facial Relief.

Separate from arguing HB 24-1136 survives First Amendment scrutiny, Colorado misguidedly contends the District Court erred in granting facial relief. Notwithstanding the determination below that the law's application was "uniform in all material respects, irrespective of the regulated social media platforms' specific attributes or content-moderation practices," AOB 27 (quoting App. 361), Colorado makes the sweeping argument that a First Amendment plaintiff "must … assess[] a law's application to 'every covered platform or function'" in order to obtain facial relief, AOB 26–27 (quoting *Moody*, 603 U.S. at 725. That is incorrect.

25

Courts—including the Supreme Court—regularly strike down content-based laws on their face without engaging in such a tortured assessment. In *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), for example, the Supreme Court invalidated a law that was "content based on its face" because it failed strict scrutiny, without any overbreadth analysis. *Id.* at 165–66, 171–72. In *Brown*, the Court affirmed an injunction against a content-based law because it failed strict scrutiny, also without any overbreadth analysis. 564 U.S. at 805 *See also, e.g., Am. Ass'n of Pol. Consultants, Inc., v. FCC*, 923 F.3d 159, 170 (4th Cir. 2019) , *aff'd sub nom. Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610 (2020) (severing content-based provision of law in its entirety from otherwise constitutional regulation because it failed strict scrutiny).

Though Colorado relies on *Moody*, it did not purport to change this analysis. Instead, it affirmed that a facial challenge will succeed where there is "no set of circumstances … under which the [law] would be valid." 603 U.S. at 723 (citation omitted). And it went on to explain that, where a plaintiff cannot meet that high standard, the doctrine of substantial overbreadth offers an alternative, "*lowered*" bar in First Amendment cases. *Id.* (emphasis added). Because of the need to "provide[

26

] breathing room for free expression," substantial overbreadth imposes a "less demanding" standard, pursuant to which a plaintiff need not show that *every* application of the law is unconstitutional, but only that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (citations omitted).

In other words, substantial overbreadth authorizes courts to invalidate even laws that have some "plainly legitimate" applications, such as when a law targeting unprotected expression sweeps in too much protected speech. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) ("The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process."). But where a law's applications are uniform, as the district court observed they are here, the only question is whether the government can carry its burden of justification under heightened scrutiny. *See Brown*, 564 U.S. at 799.

The Supreme Court rejected a version of Colorado's argument 40 years ago in *Secretary of State of Maryland v. Joseph H. Munson Co, Inc.*, 467 U.S. 947, 964 (1984). In that case, the government contended the

27

Supreme Court could facially invalidate the law at issue—which the government claimed had permissible applications—only if it first assessed the law for substantial overbreadth. But the Court disagreed. It held the law was properly subject to facial invalidation because it "impose[d] a direct restriction on protected First Amendment activity" and "the defect in the statute [wa]s that the means chosen to accomplish the State's objectives [we]re too imprecise, so that *in all its applications* the statute creates an unnecessary risk of chilling free speech." *Id.* at 966, 967–68 (emphasis added) (footnote omitted). *Cf. Johnson v. United States*, 576 U.S. 591, 602–03 (2015) (holding facial invalidation on vagueness grounds is proper even when "there is some conduct" to which the law's application would be "clear[]").

If a law is insufficiently tailored on its face, facial invalidation is the proper remedy. And as shown above, Colorado's law here is unconstitutional in full.

## IV.    Left Unchecked, HB 24-1136 Will Incentivize Other States to Attempt to Conscript Private Speakers.

The threat posed to protected speech by HB 24-1136's mandatory disclosure requirements is serious, but not unique. Similarly unconstitutional laws are germinating and taking root in state

28

legislatures across the country. Continued condemnation by courts is necessary to stop this unconstitutional trend.

As discussed above, the Fifth Circuit recently enjoined two laws that sought to conscript publishers and distributors into spreading the government's message about the speech's likelihood to harm health, particularly for minors. *See Free Speech Coal.,* 95 F.4th at 268 n.5, 280 (invalidating requirement that adult websites warn that "[p]ornography is potentially biologically addictive, is proven to harm human brain development, desensitizes brain reward circuits, increases conditioned responses, and weakens brain function"); *Book People,* 91 F.4th at 324, 340 (invalidating law requiring school book vendors to "issue sexual-content ratings for all library materials"). Similarly, a federal court in New York preliminarily enjoined a law requiring social media networks to post a policy regarding "hateful conduct," as defined by the State, because "[r]equiring Plaintiffs to endorse the state's definition of 'hateful conduct' forces them to weigh in on the debate about the contours of hate speech when they may otherwise choose not to speak." *Volokh v. James,* 656 F. Supp. 3d 431, 442 (S.D.N.Y. 2023). And the Ninth Circuit affirmed an injunction against a California law that unconstitutionally compelled

certain websites to create a report identifying the risk "of children being exposed to potentially harmful content" on their sites. *Bonta I*, 113 F.4th at 1121.

These are not the only examples of states seeking to conscript private online speakers into carrying the government's preferred message. As the litany of cases similar to this one listed in footnote 2 attests, states have pursued a variety of tactics the regulate social media in the name of protecting children, including compelling speech.

Left unchecked, unconstitutional governmental intrusions into private speech similar to HB 24-1136 will invade all aspects of digital speech. It is all too easy to imagine that, if states are granted the power, they will seek to append "disclosure requirements" to all manner of online speech about issues of the day. To protect the First Amendment rights of Coloradans, and to ensure other states do not attempt similar statutory gambits, this Court should affirm.

## CONCLUSION

For the foregoing reasons, the Court should affirm the court below.

Dated: July 17, 2026

Cody Venzke
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
915 15th St. NW
Washington, DC  20005
Email: cvenzke@aclu.org
Tel.: (202) 457-0800
*Licensed only in California.*
*Application pending in the*
*District of Columbia.*

Vera Eidelman
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18 Fl.
New York, NY  10004
Email: veidelman@aclu.org
Tel.: (212) 549-2500

Timothy R. Macdonald
Sara R. Neel
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
        OF COLORADO
303 E. 17th Avenue, Suite 350
Denver, CO  80203
Email: tmacdonald@aclu-co.org
Email: sneel@aclu-co.org
Tel.: (720) 402-3107

/s/ *D Gill Sperlein*

D Gill Sperlein
    *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave, SE, Ste. 340
Washington, DC  20003
Email: gill.sperlein@fire.org
Tel.: (215) 717-3473

*Counsel for* Amici Curiae

31

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), this document contains 6,083 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

3.     All required privacy redactions have been made per 10th Cir. R. 25.5.

4.     Any hard copies of the foregoing brief submitted to the Clerk of this Court are exact copies of the brief as filed via ECF.

5.     A virus check of the digital submission of this brief was performed using SentinelOne Singularity, and no virus was detected.

Dated: July 17, 2026                    /s/ *D Gill Sperlein*
                                        D Gill Sperlein

                                        *Counsel for* Amici Curiae

32

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2026, I electronically filed a copy of the foregoing brief with the Clerk of the United States Court of Appeals for the Tenth Circuit using the Court's appellate CM/ECF system. I further certify that to the best of my knowledge, counsel for all participants are registered CM/ECF users, and service will be accomplished via the CM/ECF system.

/s/ *D Gill Sperlein*
D Gill Sperlein

*Counsel for* Amici Curiae