25-1456

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

NETCHOICE,

     Plaintiff - Appellees,

v.

PHILIP J. WEISER, in his official
capacity as Attorney General of the State
of Colorado,

     Defendant - Appellant.

On Appeal from the United States District Court, District of Colorado
The Honorable William J. Martinez
Senior District Judge

District Court Case No. 25-cv-02538-WJM-KAS

**APPELLANT'S REPLY BRIEF**

| | |
|---|---|
| PHILIP J. WEISER<br>Attorney General | Colorado Department of Law<br>1300 Broadway<br>Denver, Colorado 80203 |
| PETER G. BAUMANN*<br>Assistant Solicitor General<br>LANE TOWERY*<br>Assistant Attorney General | Telephone:  720-508-6000<br>E-Mail: peter.baumann@coag.gov<br>     lane.towery@coag.gov<br>*Counsel of Record<br>*Attorneys for Philip J. Weiser* |

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

    I.    Social media companies are not exempt from common commercial regulations. ................................................................................................2

        A.    Social media companies engage in commercial speech. ........................2

        B.    The Act regulates only commercial speech. ...........................................4

        C.    Because the Act regulates commercial product warnings, *Zauderer* scrutiny applies. .....................................................................................9

        D.    The existing state of the research into social media and its health effects does not preclude factual, noncontroversial functions. ........................12

    II.    Section 1601 satisfies *Zauderer* scrutiny. ...............................................15

        A.    Section 1601's function is not unduly burdensome ...............................16

        B.    *NetChoice* overstates the over- and under-inclusivity of Section 1601, particularly in this facial challenge. ....................................................18

    III.    NetChoice's facial challenge fails under *Moody*. .....................................20

    IV.    Section 1601 is not vague. ......................................................................22

        A.    The law makes clear to an ordinary person which companies are regulated.............................................................................................24

        B.    The law's requirements are also clear.................................................26

CONCLUSION ....................................................................................................28

## TABLE OF AUTHORITIES

**PAGES**

**CASES**

*511 Detroit St., Inc. v. Kelley,*
807 F. 2d 1293 (6th Cir. 1986) ...................................................................24

*Am. Beverage Ass'n v. City & Cnty. of S.F.,*
916 F.3d 749 (9th Cir. 2019) ............................................................... 16, 17

*Am. Meat Inst. v. USDA,*
760 F.3d 18 (D.C. Cir. 2014) .....................................................................10

*Bolger v. Youngs Drug Prods. Corp.,*
463 U.S. 60 (1983) ................................................................................3, 8

*Brown v. Ent. Merchants Ass'n,*
564 U.S. 786 (2011) .....................................................................................6

*City of Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993) ......................................................................................3

*CTIA- The Wireless Ass'n v. City of Berkeley,*
928 F.3d 832 (9th Cir. 2019) .....................................................................14

*Dias v. City & Cnty. of Denv.,*
567 F.3d 1169 (10th Cir. 2009) ..................................................................27

*Dr. John's, Inc. v. City of Roy,*
465 F.3d 1150 (10th Cir. 2006) ..................................................................27

*Ent. Software Ass'n v. Blagojevich,*
469 F.3d 641 (7th Cir. 2006) ...................................................................6, 9

*Fabrizius v. USDA,*
129 F.4th 1226 (10th Cir. 2025) ........................................................... 23, 24

*Free Speech Coal. Inc. v. Paxton,*
95 F.4th 263 (5th Cir. 2024) .....................................................................21

*Hill v. Colorado,*
530 U.S. 703 (2000) ...................................................................................23

*Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
455 U.S. 489 (1982) ...................................................................................26

iii

*Meta Platforms, Inc. v. Bonta*,
  2026 WL 2260373 (N.D. Cal. Aug. 5, 2026)......................................................2

*Moody v. NetChoice*,
  603 U.S. 707 (2024) .......................................................... 2, 5, 6, 12, 19, 21

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*,
  556 F.3d 114 (2d Cir. 2009) ..................................................................... 10, 19

*Nat'l Ass'n for Gun Rts. v. Polis*,
  173 F.4th 1317 (10th Cir. 2026).................................................................22

*Nat'l Ass'n of Mfrs v. SEC*,
  800 F.3d 518 (D.C. Cir. 2015).................................................................. 11, 21

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018) ......................................................... 5, 8, 9, 16, 17

*NetChoice v. Bonta*,
  152 F.4th 1002 (9th Cir. 2025).................................................................27

*NetChoice, LLC v. Bonta*,
  113 F.4th 1101 (9th Cir. 2024).................................................................3

*NetChoice, LLC v. Griffin*,
  2025 WL 978607, (W.D. Ark. Mar. 31, 2025)........................................25

*Netflix, Inc. v. Colo. Dep't of Revenue*,
  575 P.3d 465 (Colo. App. 2025)................................................................12

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ................................................................................2, 6

*Pharm. Care Mgmt. Ass'n v. Rowe*,
  429 F.3d 294 (1st Cir. 2005) ...................................................................10

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ................................................................................11

*R.J. Reynolds Tobacco Co. v. FDA*,
  96 F.4th 863 (5th Cir. 2024)............................................................. 10, 11, 14

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) .................................................................................6

*Singleton v. Wulff*,
   428 U.S. 106 (1976) ...................................................................................22

*United States v. Schiff*,
   379 F.3d 621 (9th Cir. 2004) ....................................................................12

*United States v. Wenger*,
   427 F.3d 840 (10th Cir. 2005) .....................................................................8

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ...................................................................................26

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ...................................................................................28

*Wyo. Gun Owners v. Gray*,
   83 F.4th 1224 (10th Cir. 2023) ..................................................................23

*X Corp. v. Bonta*,
   116 F.4th 888 (9th Cir. 2024) ..................................................................5, 8

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
   471 U.S. 626 (1985) ......................................... 1, 7, 10, 11, 12, 18, 19

**STATUTES**

15 U.S.C. § 1333 .............................................................................................10

Colo. Rev. Stat. § 6-1-1601 ................................... 4, 10, 13, 20, 21, 24, 25, 26, 27

**OTHER AUTHORITIES**

HB24-1136L.010, https://leg.colorado.gov/bills/hb24-1136.................................20

Media Literacy Resource Bank, Colorado Department of Education,
   https://tinyurl.com/4bkv25yy .....................................................................27

**INTRODUCTION**

At root, this appeal asks if the largest companies in the modern marketplace must follow the same product warning rules that have long applied to others. Colorado's Healthier Social Media Use by Youth Act requires social media companies to disclose factual, research-based information to young users about the health effects of their own products. Those disclosures are standard commercial product warnings and fall squarely within the tradition of commercial disclosures established by *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985).

NetChoice seeks a sweeping rule that would exempt social media companies from common commercial-speech regulations. To get there, it mischaracterizes Colorado law as regulating third-party speech or platforms' content moderation — functions the statute never touches. Nor does the law require companies to adopt specific views or engage in self-condemnation. It simply requires them to provide evidence-based information about the effects of extended use of their own apps.

The Attorney General asks for a narrower holding: that social media companies, like all other commercial actors, must comply with ordinary product-warning requirements. To apply *Zauderer* to internet companies reflects the basic principle that factual warnings about a company's own products are

commercial speech even when applied to modern digital services. The Court

should reject NetChoice's effort to carve out a special exemption for social media.

## ARGUMENT

**I.     Social media companies are not exempt from common commercial regulations.**

**A.     Social media companies engage in commercial speech.**

NetChoice first seeks to evade *Zauderer* scrutiny by asserting that social

media "is speech" and, therefore, immune from regulation. Answer Br. at 23; *see*

*also id*. at 29 ("[T]he Act imposes a warning label on websites whose entire

purpose is disseminating undeniably protected speech."). To be sure, social media

companies facilitate third parties' expressive activity, *see Packingham v. North*

*Carolina*, 582 U.S. 98, 108 (2017), and may themselves engage in some degree of

expressive activity through curation and content moderation, *see, e.g., Moody v.*

*NetChoice*, 603 U.S. 707, 728, 781 (2024); *but see Meta Platforms, Inc. v. Bonta*,

No. 5:25-cv-09789-EJD, 2026 WL 2260373, at \*5 (N.D. Cal. Aug. 5, 2026)

(holding "personalized feeds" based on "algorithms' number-crunching

capabilities" is not "expressive"). Nonetheless these highly profitable and

multifaced companies undeniably *also* engage in forms of commercial speech.

Indeed, social media companies constantly engage in direct, commercial

speech with their users. *See* Opening Br. at 20. They publish terms of service,

require adoptions of their terms and conditions, push out software updates, and

inject myriad forms of notifications into their apps and onto users' personal

devices meant to invite users to open and spend more time on their apps. They

send text messages and emails to users and speak about their products across media

in TV interviews, op-eds, blog posts, informational websites, and even on other

social media sites. In this way, platforms deluge users with speech aimed at

framing perceptions of their products and encouraging more user engagement.

This commercial speech is distinct from other forms of protected expression

contained on social media platforms because it describes the terms and conditions

of commercial transactions—namely, the attributes of the commercial service

itself. Take NetChoice's comparison of social media to newspaper and book

publishers. NetChoice insists that, like *The New York Times* or Random House, the

fact that social media is a for-profit enterprise is insufficient, by itself, to turn its

expressive products into commercial speech. Answer Br. at 24 (citing *Bolger v.*

*Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983) and *NetChoice, LLC v. Bonta*,

113 F.4th 1101, 1120 (9th Cir. 2024)). The Attorney General agrees. But the

inverse of that rule applies here: the fact that *The New York Times*, Random House,

and Meta create expressive products does not mean those companies don't engage

in commercial speech. Of course they do, and NetChoice acknowledges as much.

*See* Answer Br. at 26 (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507

3

U.S. 410, 423 (1993) ("[M]uch of the material in ordinary newspapers is commercial speech[.]")).

Imagine if newspapers, for instance, had highly flammable paper known to combust on sunny dining tables. A product warning stating "newspapers left exposed to the sun for long periods create a risk of fire" would hardly be understood to regulate the paper's editorial functions or its core expressive speech. As another example, a commercial baker's cakes may be a form of protected expression, and yet his bakery would not be exempt from traditional health and safety regulations, including product safety warnings. Even the commercial service offered in *Zauderer*—attorney's services—is comprised almost entirely of protected speech, yet that did not insulate what was clearly commercial speech from the government's sensible regulation. When a company communicates with its customers about the attributes, risks, or safe use of its own products, that communication is commercial speech whether the company is *The New York Times*, a pharmaceutical company, or YouTube.

In short, that social media platforms contain protected expression does not obviate the obvious existence of the platforms' own commercial speech.

## B.    The Act regulates only commercial speech.

Colo. Rev. Stat. § 6-1-1601 ("Section 1601") requires a classic product warning label of the sort "long considered permissible" as a regulation of

4

commercial speech. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 775 (2018) ("*NIFLA*"). NetChoice misconstrues the Act to "demand[] warning labels for *fully protected speech*." Answer Br. at 28. But Section 1601 regulates only a social media company's speech to its users about its product. That speech is definitionally commercial. *See X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024). Despite NetChoice's mischaracterization of the Act, the required product warning does not implicate protected expression.

*First*, Section 1601's safety warning does not regulate social media companies' expressive product, *i.e.* its "curated compilation of speech originally created by others." *Moody*, 603 U.S. at 728.[1] It does not demand companies "carry and promote user speech that they would rather discard or downplay" or "alter the content of their expression—a particular edited compilation of third-party speech."

---

[1] NetChoice persistently conflates Section 1601's warning—a regulation of social media companies' own commercial speech—with a regulation of its expressive product. *E.g.*, Answer Br. at 29 (The "dissemination of [curated third-party] speech is entitled to full First Amendment protection, just like the compilations of speech in newspapers or magazines."). It also incorrectly implies that because social media provides an expressive product, everything it does is protected expression. *See id*. at 23 ("social media… is *speech*" (emphasis in original).

*Id.*[2] Section 1601 in no way alters companies' editorial discretion in presenting third-party speech to other users. [3]

*Second*, Section 1601 neither implicates nor regulates third-party user speech. *Cf.* Answer Br. at 25–26 ("Defendant's flawed theory treats covered services themselves—and the broad array of fully protected speech available on them—as commercial speech."). It undisputedly does not target inappropriate or disfavored third-party content. *Contrast Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006) (cited at Answer Br. at 30) (striking down law warning about inappropriate sexual content in video games). Section 1601's warning does not engage with the content of the underlying expressive activity occurring on the platform. (*i.e.*, it does not warn youth users that they might encounter, for example, eating disorder content). Nor does it limit users' access to social media companies' expressive product. *Contrast Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011)

---

[2] No recent Supreme Court case has "applied a commercial-speech analysis" to social media companies, Answer Br. at 26, because none of those cases dealt with speech that was plainly the platform's commercial speech to its users. Instead, those cases addressed, respectively, regulations targeting companies' expressive content moderation, *Moody*, 603 U.S. 707, and users' First Amendment right to access speech on social media, *Packingham*, 582 U.S. 98.

[3] Nor is Section 1601's function "inextricably intertwined" with the companies' expressive activity. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). The function operates entirely outside of the companies' content-moderation and curation activities as opposed to forcing companies to alter any of their fully-protected expression.

6

(striking down law that prohibited sale or rental of "violent" video games to minors).[4]

*Third*, Section 1601 does not regulate third-party advertisers. Answer Br. at 26. Although advertisements are commercial speech in their own right, Section 1601 neither targets third-party advertising nor social media companies' dissemination of that commercial speech.

What's more, Colorado does not create commercial speech in order to regulate it. Answer Br. at 21–22. At the outset, NetChoice offers no authority for the premise that commercial speech doctrine fails when it compels speech— *Zauderer*, of course, is a doctrine about compelled speech. *E.g.*, *Zauderer*, 471 U.S. at 650 (upholding advertisement disclosure despite it requiring attorneys "to provide somewhat more information than they might otherwise be inclined to present."). The entire point of product labeling law is to require companies to provide consumers with additional, accurate, information. And the companies are not unduly burdened by the requirement because it is insubstantial compared to the vast amounts of commercial speech the companies already engage in. Just as a

---

[4] NetChoice misconstrues prior caselaw when it argues that "the First Amendment does not permit government-mandated warning labels for movies, music, or video games." Answer Br. at 28; *also id*. at 1. As implied above, any analogy to video games cases is inapt because those cases addressed content warnings (i.e., warnings that address the content of the games, not the harm of playing games for long periods of time regardless of the content) and age-based prohibitions, neither of which is imposed by Section 1601.

product warning affixed to a toy box does nothing to create the toy box which existed before it, Section 1601's warning does not create the apps or notifications which long predate the disclosure.

Last, NetChoice's argument that Section 1601's warning itself is not commercial speech misses the mark because it relies entirely on the *Bolger* factors. *See* Answer Br. at 20–24 (citing *Bolger*, 463 U.S. at 66–67). *Bolger* is neither necessary nor sufficient to define commercial speech. For instance, the Tenth Circuit employs a "common sense" approach to the commercial speech analysis and recognizes that "[n]o single formulaic test" governs the inquiry. *United States v. Wenger*, 427 F.3d 840, 846–47 (10th Cir. 2005) (citations omitted). Courts have recognized that product warnings are commercial speech regardless of the *Bolger* factors. *See X Corp.*, 116 F.4th at 901; *also* Opening Br. at 17. And if the Court were to adopt NetChoice's interpretation of *Bolger*, it would need to hold that all product safety warnings fall outside the bounds of commercial speech altogether. *See* Opening Br. at 17. Such a holding would be at odds with Circuit and Supreme Court precedent. *Cf. NIFLA*, 585 U.S. at 775; *Wenger*, 427 F.3d at 846–47. Thus, a rigid reliance on *Bolger* would be error.

At bottom, by conflating Section 1601's regulation of commercial speech with the other protected speech in which platforms and their users engage, NetChoice hyperbolizes that the Act "would transform the entire internet into

8

commercial speech subject to reduced First Amendment protection—contrary to Supreme Court precedent." Answer Br. at 27. Not so. The Attorney General asks the Court to hold only that a classic product warning affixed to the user interface of platforms' apps is, like other product warnings before it, commercial speech.

Indeed, it is NetChoice that asks for a maximalist rule: that because social media companies facilitate third-party speech, and engage in some content-moderation, they are exempt from the commercial disclosure framework that governs other industries. That is rule with far-reaching consequences and no limiting principle. The Court should not adopt it.

**C.    Because the Act regulates commercial product warnings, *Zauderer* scrutiny applies.**

NetChoice seeks to evade *Zauderer* in several ways, all of which fail. First, by arguing that Section 1601's safety warning is compelled speech or a content-based regulation, Answer Br. at 13–16, 39–40, NetChoice misapplies First Amendment doctrine. Product warnings are permitted *despite* being content-based compelled speech. "Particularly in the commercial arena, the Constitution permits the State to require speakers to express certain messages without their consent, the most prominent examples being warning . . . labels." *Ent. Software Ass'n*, 469 F.3d at 651; *see also NIFLA*, 585 U.S. at 775. The core question is whether the speech addresses the terms and conditions of a commercial transaction—here, the

attributes of a commercial service. Here it does and thus it is subject to a standard, *Zauderer* scrutiny.[5]

Similarly, NetChoice is wrong that the Act's coverage definition is content-based and, thus, triggers strict scrutiny. *See* Answer Br. at 39. The law targets platforms based on their *function*, not their subject matter. *Compare* Colo. Rev. Stat. § 6-1-1601(4)(a)(IV) (including platforms that, have "a substantial function to allow users to interact socially with each other within the service or application") *with id*. § 6-1-1601(4)(b) (excluding services which "predominant or exclusive function" is, among other things, providing "electronic mail" or "virtual gaming.").

By definition, product safety warnings are targeted at specific products or industries. *Zauderer* itself upheld a disciplinary rule applicable only to lawyers. 471 U.S. at 632. Courts reviewing cigarette labels do not apply strict scrutiny simply because the FDA's rule requires warnings only on cigarette packages. *See, e.g.*, *R.J. Reynolds Tobacco Co. v. FDA ("RJRT")*, 96 F.4th 863, 867 (5th Cir. 2024) (citing 15 U.S.C. § 1333). Legislatures can decide what problems to solve

---

[5] And contrary to the claims of amici, *Zauderer* is not limited to correcting fraudulent advertisements. *See* Brief of Wash. Legal Found. at 11. *Zauderer* applies to all manner of commercial disclosures, including standard product health and safety warnings. *See, e.g.*, *Am. Meat Inst. v. USDA*, 760 F.3d 18, 22 (D.C. Cir. 2014) (holding that *Zauderer* extends beyond correcting deceptive advertising); *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 133 (2d Cir. 2009) (same); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (Boudin, C.J., and Dyk, J., concurring) (same).

10

and how to target those solutions. *See, e.g.*, *Zauderer*, 471 U.S. at 651 n.14 (1985) (explaining "governments are entitled to attack problems piecemeal"); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388–89 (1992) (explaining why states can, consistent with the First Amendment, target some commercial speech but not others). In this case, the problem is youth social media addiction; the law addresses this problem by targeting social media.

Next, Section 1601's warning does not escape *Zauderer* as compelled self-condemnation. *See* Answer Br. at 18. Almost by definition in the product warning space, companies "presumably would prefer to avoid" making the disclosure. *Nat'l Ass'n of Mfrs v. SEC*, 800 F.3d 518, 540 (D.C. Cir. 2015) (Srinivasan, J., dissenting). But a company's preference not to disseminate a product warning does not render the compelled disclosure unconstitutional under *Zauderer*. "[I]f mere dislike sufficed, the government could never compel any disclosure. . . . That proves too much." *RJRT*, 96 F.4th at 881 n.58. Moreover, social media companies are not required to condemn any substantive or expressive speech under the law. *Contra* Answer Br. at 17 and App. Vol. II at 369. Instead, the law requires companies to warn users about the health effects of prolonged *time* spent on social media, which is distinct from any content moderation function performed by social media companies.

11

Finally, NetChoice is wrong that social media companies are exempt from product warnings because social media is not a "tangible product." Answer Br. 28–29. NetChoice cites no authority for this remarkable proposition, and the Attorney General is aware of none. *But see Netflix, Inc. v. Colo. Dep't of Revenue*, 575 P.3d 465, 469 (Colo. App. 2025) (holding that a streaming subscription is tangible personal property). To the contrary, *Zauderer* itself dealt with commercial services, not tangible products. 471 U.S at 650–51; *see also United States v. Schiff*, 379 F.3d 621, 630–31 (9th Cir. 2004) (holding that government could compel website operator to post information about criminal liability if patrons used website to evade taxes). That product safety warnings are only recently being applied to social media—a new technology—is not sufficient reason for the Court to exempt these companies from such warnings. *See Moody*, 603 U.S. at 727–28 ("Despite the relative novelty of the technology before us, the main problem in this case—and the inquiry it calls for—is not new.").

In sum, Section 1601's product warning is not distinct from other product warnings long held constitutional, and social media is not a product exempt from warnings applied to other products. *Zauderer* scrutiny is appropriate.

### D. The existing state of the research into social media and its health effects does not preclude factual, noncontroversial functions.

NetChoice's final salvo is that *Zauderer* does not apply because the functions required by Section 1601 are neither factual nor uncontroversial. Answer

Br. at 32. But the flexibility inherent in Section 1601 allows NetChoice's members to embrace the existing state of the research.

Under Section 1601, the only requirement imposed on covered entities is that they establish a function that (1) provides underage users "with information about their engagement in social media," (2) which "helps the user understand the impact of social media on the developing brain and the mental and physical health of youth users," and is (3) "supported by data from peer-reviewed scholarly articles or the sources included" in the mental health and technology resource bank. Colo. Rev. Stat. § 6-1-1601(2). This flexible standard allows companies to craft functions that reflect the existing state of the research. To the extent that research is "equivocal," Answer Br. at 33, the functions can include that equivocation.

Consider the context in which the question would be litigated. In any enforcement action, the Attorney General would bear the burden of proving that the function did *not* contain "information . . . supported by peer-reviewed scholarly articles" or sources included in the mental health resource bank. Colo. Rev. Stat. § 6-1-1601(2). If NetChoice's covered entities can substantiate that the state of the research is equivocal, they can relay that equivocation in their functions and in defense of any enforcement challenge. Of course, the authorities on which NetChoice relies do not equivocate nearly as much as NetChoice suggests. *Compare* Answer Br. at 33–34 *with* Opening Br. at 4–5, 31–32.

13

Similarly, NetChoice's arguments concerning controversy are wrong on both the facts and the law. With respect to the former, Section 1601 "does not force [social media platforms] to take sides in a heated political controversy." *CTIA- The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 848 (9th Cir. 2019). NetChoice cannot declare the conversation around healthy social media use controversial any more than cigarette manufacturers can declare tobacco warnings controversial because they "dislike the nature of the warnings." *RJRT*, 96 F.4th at 882. "[J]ust as bankruptcy warnings, disclosure of stock buyback rationales, and explanations of social media censorship decisions may induce emotions or be related to ideological and political issues while remaining uncontroversial," so too can disclosures that comply with Section 1601. *Id.*

Unlike laws that prescribe the content of a product safety warning, Section 1601 does not establish a single "underlying proposition." Answer Br. at 37. Rather, the General Assembly credited what the industry said during the legislative process and what they say again here: the information appropriate for young people on one platform may differ from what is appropriate elsewhere. *See, e.g.*, Answer Br. at 23–24. To the extent there is a single underlying proposition relevant to all functions under Section 1601, it is that providing research-backed information to underage users enables them to make informed decisions about their

14

social media use. That proposition is "factually settled," in the sense that it is required by statute to reflect the state of the research, and uncontroversial.

Finally, the existence of lawsuits alleging that NetChoice's members have harmed the public do not create sufficient controversy to avoid the flexible functions mandated by Section 1601. *See* Answer Br. at 39. To the extent the companies' functions are supported by peer-reviewed research—and are consistent with the companies' existing obligations under tort law—it is difficult to imagine how they might "provoke additional claims." *Contra* Answer Br. at 38.[6]

## II.    Section 1601 satisfies *Zauderer* scrutiny.

Because Section 1601 regulates commercial speech, the Attorney General has not argued before this Court that it is subject to, or meets, strict scrutiny.[7] Rather than grapple with the Attorney General's arguments for how Section 1601 satisfies *Zauderer*, *see* Opening Br. at 29–37, NetChoice confines its response to less than a page of its Answer Br. at 46–47. NetChoice's limited arguments are unavailing.

---

[6] In all instances, the companies can satisfy their legal obligations under Section 1601 by disclosing factual information. If companies are hesitant to do so, that hesitancy is not license to avoid a straightforward product labeling requirement.

[7] The Attorney General did argue before the district court that Section 1601 satisfies strict scrutiny. App. Vol. II at 239–40; *contra* Answer Br. at 2.

### A.    Section 1601's function is not unduly burdensome.

NetChoice's only argument for why Section 1601 cannot survive *Zauderer* scrutiny is that the functions are "'unjustified and unduly burdensome'" because they "threaten to 'drown out' the speech that covered websites present to users." Answer Br. at 46 (quoting *NIFLA*, 585 U.S. at 778 and citing *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 757 (9th Cir. 2019)). But the warnings at issue in *NIFLA* and *American Beverage Association* are readily distinguishable.

*NIFLA* addressed a statement certain facilities needed to include on "all print and digital advertising materials." 585 U.S. at 778. The statement consisted of 29 words, which would need to appear in at least two languages in the "vast majority" of California counties (and in as many as 13 different languages in Los Angeles County). *Id.* at 802 (Breyer, J., dissenting). In that circumstance, the Court held that the statement, especially in non-digital spaces like billboards and newspaper ads, would "drown[] out the facility's own message." *Id.* at 778. The statement was so burdensome, in fact, that the Court concluded it was "[m]ore likely" that the requirement would prevent organizations from even advertising in the first place. *Id.*

So too in in *American Beverage Association*, 916 F.3d at 757. There, the Ninth Circuit confronted a product warning that, by law, needed to "occupy at least 20% of the advertisement" to which it was being applied. *Id.* at 754. The court held

16

that a statement which covers 20% of an advertisement could "drown out" the underlying advertisement, or even "effectively rule out the possibility of having an advertisement in the first place." *Id.* at 757 (quoting *NIFLA*).

NetChoice has never argued that Section 1601's requirement might prevent social media companies from speaking altogether. And for good reason. For starters, the law requires only an intermittent message that briefly displays, under certain circumstances, for a subset of users, with, at most, an incidental effect on any protected expression. By contrast, the statements at issue in *NIFLA* and *American Beverage Association* were physically overwhelming next to company's covered expression.

And unlike those statements, which were burdensome precisely because of their rigidity, the function required under Section 1601 is deliberately flexible. There is no size requirement, *contra Am. Beverage Ass'n*, 916 F.3d at 757, and no requirement that it be replicated in more than one language, *contra NIFLA*, 585 U.S. at 778.

Finally, NetChoice's arguments that these brief pop-up notifications would "significantly interfere[]" with covered entities' expression is belied by both the record and common sense. Answer Br. at 46. First, several of NetChoice's declarants admit they provide similar notifications, presumably without suffering

17

the "significant interference" NetChoice hypothesizes. *See* App. Vol. I at 166–67; 179; 195.

Second, NetChoice's assertion is belied by everyday experience on social media. Today's users face a barrage of pop-up notifications and unsolicited messages. Such pop-ups are a feature of many platforms. When a Facebook user receives a message notification while scrolling through their home feed, that notification does not "significantly interfere" with whatever "expressive activity" Meta is engaging in during that moment.

### B.    *NetChoice* overstates the over- and under-inclusivity of Section 1601, particularly in this facial challenge.

While arguing that Section 1601 cannot satisfy strict scrutiny, NetChoice mentions in passing that it is not properly tailored "under any level of heightened scrutiny" because it is both over- and under-inclusive. Answer Br. at 43. But Section 1601 is neither.

First, NetChoice points to no authority applying over- or under-inclusivity to *Zauderer*. To the contrary, under *Zauderer*, a disclosure requirement will be upheld so long as the requirement is "reasonably related to the State's interest." 471 U.S. at 651.[8]

---

[8] Analytically, one way to consider the standard under *Zauderer* is that the "tailoring" is done by requiring disclosures to be "factual and noncontroversial," and not unduly burdensome. 471 U.S. at 651. Once those standards are met, and *Zauderer* applies, no further heightened tailoring is necessary.

*Zauderer* itself explicitly forecloses NetChoice's under-inclusivity argument. 471 U.S. at 651 n.14; *see also N.Y. State Rest. Ass'n*, 556 F.3d at 134 ("[T]he First Amendment does not bar the city from compelling . . . under-inclusive factual disclosures.") (quotation omitted). Although NetChoice faults the State for not imposing similar requirements on "gaming websites" or "streaming shows on Hulu," Answer Br. at 45, "governments are entitled to attack problems piecemeal" in enacting regulations that are not subject to strict scrutiny, *Zauderer*, 471 U.S. at 651 n.14.

As for over-inclusivity, NetChoice alleges that Section 1601 applies to more websites than is necessary to address its state interest. Answer Br. at 43–44. But NetChoice's facial claim is fatal to this argument. Even if NetChoice were correct that Section 1601 can only be applied to four of the ten members it identifies in this lawsuit, Answer Br. at 44, those four websites would not provide a sufficient "legitimate sweep" to justify facial relief. *See Moody*, 603 U.S. at 723.

The same is true of NetChoice's invocation of specific instances in which a person's use of social media may be beneficial, rather than harmful. Answer Br. at 44–45. Section 1601 does not rest on an assumption that all social media is harmful. To the contrary, Section 1601 only requires factual, evidence-backed information so that users can make informed choices about how best to use social

19

media. That a time-based notification may interrupt a Stephen Hawking video as opposed to a Nickelodeon cartoon, is of no moment to the constitutional analysis.

## III.    NetChoice's facial challenge fails under *Moody*.

NetChoice adopts the district court's flawed reasoning that Section 1601's "scope and application are uniform in all material respects, irrespective of the regulated social media platforms' specific attributes or content-moderation practices." Answer Br. at 47–48 (quoting App. Vol. II at 361).

But throughout its brief, NetChoice itself emphasizes the distinctions between different platforms covered by Section 1601, Answer Br. at 44, even distinguishing between how the law might apply to one of its members, Nextdoor, compared to other websites about which there is more research, Answer Br. at 23. If NetChoice asserts that what might be factual for one of its members, might not be for another, then facial relief is inappropriate. Note, too, that there is no prescribed, uniform language to analyze here because, as a concession to the industry,[9] the General Assembly permitted a great deal of flexibility.

The significant differences between NetChoice's covered members and the flexibility offered by Section 1601 mean that the Court must assess Section 1601's

---

[9] As originally considered in Committee, Section 1601 contained only a time-based notification (codified at Section 6-1-1601(1)(b)). After negotiations, Section 1601 was amended on the floor of the Senate to permit entities to develop their own function (codified at Section 6-1-1601(1)(a)). *See* HB24-1136L.010, *available with* HB24-1136's complete history at https://leg.colorado.gov/bills/hb24-1136.

application to "every covered platform or function," to weigh the constitutional applications against any unconstitutional ones. *Moody*, 603 U.S. at 725.

It is not hard to imagine constitutional applications. Consider a function on YouTube that consists of the following text:

> **Time for a break?**
> **Research shows that sleep**
> **can improve mental and**
> **physical health.**

Such a function would satisfy the statute. It provides underage users with information that "helps the user understand the impact of social media on the developing brain and the mental and physical health of youth users," Colo. Rev. Stat. § 6-1-1601(2), and is supported by some of the very peer-reviewed scholarly sources NetChoice cites in its Answer Brief. It also satisfies *Zauderer*. None of its information is "subject to good-faith scientific or evidentiary dispute," Answer Br. at 32 (quoting *Free Speech Coal. Inc. v. Paxton*, 95 F.4th 263, 281–82 (5th Cir. 2024)), or requires YouTube to "wade into a controversial debate." *Id*. at 39. This satisfactory function would not require YouTube to "publicly condemn itself." *Id*. at 18 (quoting *Nat'l Ass'n of Mfrs.*, 800 F.3d at 530). And its minimal burden is

21

proven by the fact YouTube already provides "bedtime reminders" that are "turned

on by default for all users [YouTube] knows to be under 18." App. Vol. I at 167.[10]

Had the General Assembly elected to prescribe such specific disclosures,

that language would plainly satisfy *Zauderer*. The General Assembly's choice to

offer companies even greater flexibility in designing their function is a feature of

Section 1601, not a bug. Because of that flexibility, facial relief is unavailable.[11]

## IV.   Section 1601 is not vague.

NetChoice urges this Court to alternatively affirm the district court's

injunction by concluding the Act is unconstitutionally vague. Answer Br. at 51.

But the district court did not rule on this issue, and this Court should remand so the

district court can consider it in the first instance. *Nat'l Ass'n for Gun Rts. v. Polis*,

173 F.4th 1317, 1332 (10th Cir. 2026) (citing *Singleton v. Wulff*, 428 U.S. 106, 120

(1976) ("It is the general rule, of course, that a federal appellate court does not

consider an issue not passed upon below.")).

---

[10] NetChoice faults the Attorney General for not answering a litany of questions associated with the compliant example in its Opening Brief, Answer Br. at 50, but those questions are irrelevant to the constitutional or statutory question. Nothing in Section 1601 requires companies to identify in their function the "studies the warning references," or their "methodology." *Id.* Companies only need to be prepared to defend their chosen language against the statutory requirements.

[11] Consider also that, to successfully enforce Section 1601, the Attorney General would bear the burden of not only proving the statutory elements, but also defeating an as-applied First Amendment defense.

Regardless, the Act is not unduly vague. A statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fabrizius v. USDA*, 129 F.4th 1226, 1237 (10th Cir. 2025) (quotation and alteration omitted). This standard "does not . . . impose impossible standards of specificity." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023). Rather, a statute is not vague if "it is clear what the [statute] as a whole prohibits." *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quotation omitted). Where the law being challenged is civil rather than criminal, "the Supreme Court has 'expressed greater tolerance . . . because the consequences of imprecision are qualitatively less severe.'" *Fabrizius*, 129 F.4th at 1238 (quotation omitted).

Because NetChoice brings a facial vagueness challenge, it must show that "no set of circumstances exists under which the statute would be valid." *Wyo. Gun Owners*, 83 F.4th at 1234 (explaining this standard in the context of a First Amendment vagueness challenge) (quotation and alteration omitted). A law is "not vague facially if it has a plainly legitimate sweep, . . . or if it delineates its reach in words of common understanding." *Fabrizius*, 129 F.4th at 1238 (cleaned up, quotations omitted).

23

### A.    The law makes clear to an ordinary person which companies are regulated.

First, the statute is clear as to its reach, defining "social media platform" with multiple objective inclusion criteria including user thresholds, account creation, user-generated content, and social interaction. *See* Colo. Rev. Stat. § 6-1-1601(4)(a). The statute then lists applications that are excluded from this definition, stating that the term "social media platform" does not include internet-based services or applications in which the "predominant or exclusive function" falls within sixteen specifically enumerated categories like providing email or interactive gaming. *See id*. § 6-1-1601(4)(b).

NetChoice contends that Section 6-1-1601(4) is vague because it does not define "predominant or exclusive function," and because one inclusion criterion—allowing users to create an account "for the purpose of allowing users to create, share, and view user-generated content," *id*. § 6-1-1601(4)(a)(II)—does not specify whose "purpose" is at issue. *See* Answer Br. at 52–53. Both arguments fail.

The terms "predominant" and "exclusive" have plain, readily understood meanings. *See Fabrizius*, 129 F.4th at 1237 (statutes are vague only if they fail to give "a person of ordinary intelligence fair notice"). "Predominant" means the "most frequent or common," while "exclusive" means single or sole. These are "words of common understanding." *See id.* at 1238 (quotation omitted); *see also 511 Detroit St., Inc. v. Kelley*, 807 F. 2d 1293, 1296 (6th Cir. 1986) (rejecting

24

argument that "predominant" is vague).[12] Moreover, the categories of websites

excluded by the Act's definition—*e.g.*, "electronic mail," "video conferencing,"

"news" that is not user-generated, "gaming," "streaming service"—are widely

recognizable to ordinary internet users.

The Colorado statute is also clear about whose purpose is at issue. A social

media platform is one that "[p]ermits a person to become a registered user,

establish an account, or create a public or semipublic profile for the purpose of

allowing users to create, share, and view user-generated content through the

account or profile." Colo. Rev. Stat. § 6-1-1601(4)(a)(II). While NetChoice

questions whether the "purpose" is the platform's or the user's, the full text of the

---

[12] NetChoice's citation to *NetChoice, LLC v. Griffin*, 23-cv-5105, 2025 WL 978607, (W.D. Ark. Mar. 31, 2025)—an out-of-circuit, non-precedential case—is not to the contrary. There, the district court enjoined an Arkansas law requiring social media companies to implement "reasonable age verification" measures. *Id.* at *1. The court applied a "more stringent vagueness test" than applies here, because the Arkansas law conditioned access to speech on age-verification processes (versus here, where the law does not limit users' access to speech) and imposed criminal penalties for noncompliance (versus the Colorado law, which does not). *See id.* at *15. Applying these more stringent standards, the Arkansas court found that the law's core definition of a "social media company" was vague, and that this vagueness was compounded by other undefined terms like "predominant . . . function." *See id.* at *16. Here, by contrast, Section 1601's core definition of "social media platform" is not vague; the phrase "predominant or exclusive function" appears only in the definitional carve-outs that narrow the statute's coverage; and this term is further narrowed by sixteen itemized categories that themselves contain measurable quantifiers. *See generally* Colo. Rev. Stat. § 6-1-1601(4)(b).

provision shows it is the platform's purpose, since only the platform "allow[s] users to create, share, and view user-generated content." *Id*.

**B.      The law's requirements are also clear.**

Finally, Section 1601's operative warning provisions are equally straightforward. The statute sets forth two options for compliance: a time-based notification and a more substantive safety warning. *See* Colo. Rev. Stat. § 6-1-1601(1). What NetChoice characterizes as vagueness is actually bounded discretion. To the extent questions remain about the required function, the statute provides for additional administrative guidance that is not yet published, making NetChoice's vagueness claims unripe. Courts have repeatedly observed that agency guidance can clarify statutory language and reduce vagueness concerns. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 (1989) ("In evaluating a facial challenge . . . a federal court must consider any limiting construction that a state court or enforcement agency has proffered.") (citation and alterations omitted).

This principle is particularly applicable in the context of economic regulations, where a less strict vagueness test applies because regulated entities can seek clarification through administrative processes. *Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 504 (1982). Here, NetChoice can suggest

resources for the State's Media Literacy Resource Bank,[13] or engage directly with the Chief Information Officer or the Director of the Center for Health and Environmental Data Division, both of whom will play a role in establishing the standards, Colo. Rev. Stat. § 6-1-1601(5).

Thus, to the extent NetChoice claims that Section 1601 is vague even considering the anticipated guidance, those claims are not yet ripe and lack the factual record necessary for adjudication. *See, e.g.*, *NetChoice v. Bonta*, 152 F.4th 1002, 1018 (9th Cir. 2025) (rejecting NetChoice's challenge to California's age verification law on ripeness grounds because "the state attorney general has not yet issued regulations defining what NetChoice members must do to verify users' age. Nor is there any indication what those regulations will require.").

In sum, facial invalidation is "strong medicine," reserved only for statutes that are vague "in the vast majority of [their] applications" or "impermissibly vague in all of [their] applications." *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006); *Dias v. City & Cnty. of Denv.*, 567 F.3d 1169, 1179–80 (10th Cir. 2009). NetChoice cannot meet that burden here. The statute provides clear guidance and bounded discretion for how companies may comply and promises additional clarity in the form of forthcoming standards. That "plainly

---

[13] *See* Media Literacy Resource Bank, Colorado Department of Education, https://tinyurl.com/4bkv25yy (last visited Aug. 14, 2026).

legitimate sweep" forecloses NetChoice's challenge. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).

## CONCLUSION

At minimum, this Court should reverse the district court's conclusion that Section 1601 does not regulate commercial speech and vacate the preliminary injunction. The Attorney General also respectfully requests that the Court hold that *Zauderer* scrutiny applies and that NetChoice is unlikely to succeed on the merits of its First Amendment claim because the challenged section of the Healthier Social Media Use by Youth Act is likely constitutional on its face.

Respectfully Submitted,

PHILIP J. WEISER
Attorney General

/s/ *Lane Towery*
PETER G. BAUMANN*
Assistant Solicitor General
LANE TOWERY*
Assistant Attorney General

Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, Colorado  80203
Telephone:  (720) 508-6000
E-Mail:  peter.baumann@coag.gov
lane.towery@coag.gov
*Counsel of Record
*Attorneys for Philip J. Weiser*

28

## WORD COUNT AND TYPEFACE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) (excluding the items listed under Fed R. App. P. 32(f)) because

this brief contains 6,369 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface (fourteen-point Times New Roman) using Microsoft Word.

Date: August 14, 2026

_s/ Lane Towery_
LANE TOWERY
Assistant Attorney General